[Nos. 60975-6; 60976-4; En Banc. September 8, 1994.] 60977-2.

THE STATE OF WASHINGTON, ET AL., *Respondents*, v. JERRY A. WITTENBARGER, ET AL, *Petitioners*.

THE STATE OF WASHINGTON, *on the Relation of Seth Dawson, as Prosecuting Attorney for Snohomish County, Respondent*, v. SOUTH DISTRICT COURT, ET AL, *Appellants*.

THE STATE OF WASHINGTON, *Appellant*, v. REGINALD MATTHEWS, ET AL, *Respondents*.

*Steven C. Ashlock; Lovie L. Bernardi* of *Snohomish County Public Defender Association*, for petitioners Wittenbarger, et al.

*Neil M. Fox* and *Christine A. Jackson* of *Seattle-King County Public Defender Association*, for respondents Matthews, et al.

*Seth R. Dawson, Prosecuting Attorney for Snohomish County*, and *Constance M. Crawley, Deputy; Norm Maleng, Prosecuting Attorney for King County, Donald J. Raz, Senior Deputy*, and *Lana Morgan* and *Stephen G. Teply, Deputies*, for State.

DOLLIVER, J. — Breath alcohol analysis in Washington is currently tested using BAC Verifier DataMaster (Data-Master) machines, which have completely replaced the previously used Breathalyzers. The admissibility of DataMaster breath test results has been widely challenged in recent DWI prosecutions under RCW 46.61.502, Washington's driving while under the influence of intoxicants (DWI) statute.

The three cases in this opinion, which represent many consolidated DWI cases, were linked due to the similarity of the issues raised. In each of the cases, the Defendants' Data-Master breath test results were suppressed and the prosecutions were dismissed. The District Courts cited both constitutional and statutory grounds for the suppressions. We begin by addressing the issue of constitutional due process, the sole issue raised in *State v. Matthews*.

Because the basic facts underlying the cases are essentially the same, we detail the facts more fully in *State v. Matthews* and incorporate additional facts as needed in

472

*State ex rel. Dawson v. South Dist. Court* and *State v. Wittenbarger.*

## STATE V. MATTHEWS

Each of the Defendants in this case was arrested for a suspected DWI violation. As part of the investigation, the Defendants each submitted to a DataMaster chemical breath analysis and registered a breath alcohol content above the legal limit of .10 percent. When DWI charges were brought in the Shoreline Division of King County District Court, counsel for the Defendants submitted pretrial motions for suppression of the DataMaster results on the grounds, among others, that their due process rights were violated by the State's failure to preserve maintenance and repair records on the DataMaster machines. Because the cases involved identical issues, they were consolidated for a suppression hearing.

Rather than submit new expert testimony on the issues in this case, the parties stipulated to a record consisting primarily of the transcripts from two similar cases in Bellevue and Renton District Courts. The extensive detailed testimony addresses the technology of the DataMaster machines, the relevance and value of various DataMaster records, and the circumstances surrounding the development of the new Washington Administrative Code procedures for DataMaster operation and maintenance.

Under RCW 46.61.506(3), the State Toxicologist has the delegated authority to approve breath testing procedures and protocols and has recently drafted revised protocols and procedures for breath testing to reflect the switch to the updated DataMaster technology. The new procedures became effective in 1991 and are found in WAC 448-13. Under WAC 448-13-050, the accuracy of the DataMaster test results is ensured by adherence to specific testing procedures. For example, before a breath test is performed, the DataMaster operator must observe the individual for 15 minutes and check his or her mouth for substances that might affect the test. When testing begins, a blank test is

conducted to ensure that the internal air of the DataMaster chamber contains no alcohol from a previous test that could interfere with the current results. Next, the individual blows into the machine, and the first breath sample is tested, followed by another blank test. At this point, a specially prepared simulator solution with a known alcohol content is tested to verify that the DataMaster is correctly performing the chemical analysis. After a third blank test, the individual gives another breath sample followed by a final blank test. The results of these tests are printed out on a breath ticket.

In order to be considered valid, the entire test must be performed following all protocol, the blank tests must register a 0.00 alcohol content, the results of the two breath samples must be within plus or minus 10 percent of the average of the two measurements, and the reading from the simulator test must be within 10 percent of the known alcohol content. WAC 448-13-050, -060.

In addition to the breath test protocol, the State Toxicologist has developed a quality assurance protocol (QAP) designed to ensure the DataMasters are maintained in proper working order on a regular basis. *See* WAC 448-13-110. Under the QAP, a DataMaster is officially approved for use only after a thorough inspection of its components. Such an inspection is also required at least every 12 months and after most repairs.

Under the new QAP, the actual procedures used to evaluate and approve the DataMasters closely resemble those previously used to certify the Breathalyzer machines. The State's record-keeping policies, however, have been revised. For example, specific data from the inspections is no longer recorded. Instead of recording information such as initial voltage values, adjusted voltage values, and calibration factors, the technicians merely indicate that the required tests were performed with satisfactory results by checking a box on the inspection forms.

The Defendants contend that these detailed inspection records, along with additional repair and maintenance

records no longer generated by the State, are necessary to their defense. In support of this contention, the defense presented the testimony of two experts, Dr. Richard Jensen, forensic scientist, and Carol Murren, former employee of the State Toxicologist. The experts essentially testified that *all* records of machine malfunctions and repairs would be useful and should be retained in order to assist the defense in challenging the reliability of the DataMasters.

The District Court suppressed the results of the Defendants' BAC Verifier DataMaster breath test results on the ground that the State, by no longer generating certain maintenance repair records, deprived the Defendants of due process of law under both the Fourteenth Amendment and article 1, section 3 of the Washington State Constitution. The State filed a RALJ appeal in King County Superior Court, but before the appeal was heard, the Court of Appeals granted a motion for direct review. The appeal was then certified to this court and linked for oral argument with two similar cases. We find that neither federal nor state due process requires state law enforcement agencies to keep additional DataMaster records, and, therefore, we reverse the District Court's suppression order.

In recent years we have left open the question of whether the due process clause of our state constitution places more stringent requirements on the State in the area of preservation of evidence for the defense. *See State v. Furman*, 122 Wn.2d 440, 858 P.2d 1092 (1993); *State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992); *State v. Straka*, 116 Wn.2d 859, 810 P.2d 888 (1991). Today, after consideration of the six factors set out in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), we hold that the state due process clause affords the same protection regarding a criminal defendant's right to discover potentially exculpatory evidence as does its federal counterpart.

■  The Fourteenth Amendment requires that criminal prosecutions conform with prevailing notions of fundamental fairness, and that criminal defendants be given a meaningful opportunity to present a complete defense. *Cali-*

*fornia v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984). To comport with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense. *See Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *California v. Trombetta, supra.*

■ Two Supreme Court cases, *California v. Trombetta, supra*, and *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), developed a test to determine whether the government's failure to preserve evidence significant to the defense violates a defendant's due process rights. It is clear that if the State has failed to preserve "material exculpatory evidence" criminal charges must be dismissed. Recognizing that the right to due process is limited, however, the Court has been unwilling to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. A showing that the evidence might have exonerated the defendant is not enough. In order to be considered "material exculpatory evidence", the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489.

In *Trombetta*, the evidence at issue consisted of several DWI defendants' breath test samples tested by the State and then discarded. Applying its test, the Court held that the destroyed breath samples were not material exculpatory evidence and reinstated the DWI convictions. The Court found the exculpatory value of the samples to be quite low, pointing out that given the accuracy of California's Intoxilyzer the breath test samples would have been much more likely to be inculpatory than exculpatory. *Trombetta*, 467 U.S. at 489-90. Furthermore, the Court found that the defendants had means, other than retesting the original

breath samples, to demonstrate their innocence. *Trombetta*, 467 U.S. at 490.

. In similar circumstances, we held in *State v. Straka, supra*, that due process did not require the State to generate and preserve records of invalid message codes on the Data-Masters. These messages appear to alert the operator that the DataMaster is unable to perform a reliable test due to either an electrical misadjustment or the presence of mouth alcohol. *Straka*, 116 Wn.2d at 879. We found the invalid sample messages were not material exculpatory evidence because they do not confirm or deny the accuracy of a particular breath test and, thus, are not directly related to guilt or innocence of an individual charged under the DWI statute. *Straka*, 116 Wn.2d at 885.

Likewise, we find that the maintenance and repair records sought by the Defendants in this case are not directly related to the accuracy of a particular breath test. Unlike the breath test ticket, which contains specific information regarding the accuracy of each DataMaster reading, evidence of past repairs is only tangentially related to whether the machine is properly functioning on a given day. Any additional repair and maintenance records would merely be used by the defense to discredit the general reliability of the DataMaster results.

Moreover, DWI defendants have alternative means of attacking the credibility of DataMaster breath tests, including cross examination of the DataMaster operator regarding operator error, expert testimony regarding the DataMaster machines and infrared spectroscopy, as well as evidence of additional independent breath or blood tests obtained under RCW 46.61.506(5). To further assist them in their defense, the defendants have access to protocols, the Washington State Patrol policy manual, the qualifications of the Data-Master operator and the breath test ticket itself, which contains a detailed record of the DataMaster breath test results, including the readings of the blank tests and the tests of the simulator solution. *See* WAC 448-13-130; *Straka*, 116 Wn.2d at 875.

■ Thus, applying the *Youngblood* test, we find that the maintenance and repair records at issue in this case do not rise to the level of "material exculpatory evidence" and are, at best, only potentially useful to the defense. Under the Fourteenth Amendment, failure to preserve "potentially useful" evidence does not constitute a denial of due process unless a criminal defendant can show bad faith on the part of the State. *Youngblood*, 488 U.S. at 58.

The Defendants concede that the State in this case has acted in compliance with its established policy regarding the evidence at issue, a fact that we have found in the past to be determinative of good faith. *See Ortiz*, 119 Wn.2d at 302. *Cf. Trombetta*, 467 U.S. at 488. They argue, however, that here, unlike a typical preservation of the evidence case, the normal procedures themselves constitute a pattern of bad faith designed by the State to systematically deny DWI defendants access to useful evidence. They contend that it is patently unfair for the State to rely heavily on DataMaster test results to obtain DWI convictions on one hand, while simultaneously limiting the universe of evidence that the defense can use to challenge those test results. The Defendants also allege the State no longer keeps certain maintenance and repair records because defense attorneys have used them successfully to challenge DWI prosecutions in the past. They point to meetings between the State Toxicologist and prosecuting attorneys, arguing that the new protocols were drafted with a prosecutorial bias. The record reveals, however, that the defense bar also had opportunity to voice concerns regarding the proposed changes in protocol and the promulgation of WAC 448-13.

■ The fact that the State Toxicologist was aware the criminal defense bar was opposed to the changes in record-keeping policy and that defense counsel had found the old records useful does not lead us to conclude the State acted in bad faith when it made the changes. Rather, our review of the record convinces us the State Toxicologist was acting in good faith and pursuant to his statutorily delegated authority when he opted to revise the breath testing protocol

and update the State's record-keeping procedures. The protocols contained in WAC 448-13 represent a good faith effort on the part of the State to verify that the DataMasters are in good working order and are performing accurate chemical breath analysis each time an individual is tested.

Furthermore, the fact that the State has ceased to keep records it kept in the past does not in itself constitute a showing of bad faith. The Defendants have failed to convince us the State's reduction in the amount of data retained from the results of the various tests performed on a DataMaster during a QAP inspection was improperly motivated. Specifically, the defense requested voltage values, frequencies and distances used to test radio frequency interference, values used to detect acetone, and previous calibration factors, all of which are no longer retained by the State. The State has not made any changes to the battery of tests performed on the DataMasters, and elimination in the records of the specific statistics and numerical values obtained from these tests is not inherently evil. In fact, the record shows that given the DataMaster technology, the State no longer had use for the specific readings. For example, the records of voltage values are no longer needed because any voltage fluctuations affecting a breath test would show up on the breath test ticket at the time of a test.

In maintaining it acted in good faith, the State has provided logical and valid reasons for other changes in its record-keeping policies as well. For example, the telephone complaint forms requested by the defense were previously filled out each time a problem with a DataMaster was reported. Initially designed to provide the repair technicians with specific information regarding a malfunction, the forms were useless in practice because the technicians rarely received the forms until after they had repaired the malfunctioning machine. This indicates the State's elimination of the forms did not stem from bad faith.

The defense also requested records of repairs to DataMaster circuit boards completed by Mark Stone, an electrician employed by the Washington State Patrol. Trooper

Stone does not keep the notes from the technicians, which are often attached to the boards to alert him to the possible cause of the malfunction, because they often do not reflect the actual problem with the board. These notes would be of little value to the defense, and failure to keep these notes does not constitute bad faith. Once the boards have been repaired and placed into a machine, the Data-Master must again undergo a complete inspection to verify that it is functioning properly before it can be approved for use in the field. WAC 448-13-050. Records of this QAP inspection are available to the defense.

In our view, the records currently available to the defense contain ample information regarding the condition of the DataMasters. The new protocols, coupled with the improved DataMaster technology, create a system of accurate and reliable chemical breath analysis. Absent a more convincing showing by the defense, we make no finding of bad faith and, thus, find no due process violation.

Next, we move to the issue of our state constitution. Defendants argue that the State's failure to generate and preserve the requested maintenance and repair records violates their due process rights under article 1, section 3 of the Washington State Constitution. They urge us to employ the "reasonable balance" analysis of *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983) and *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976), which would not necessarily require a finding of bad faith for suppression of potentially exculpatory evidence. As we held in *State v. Straka, supra*, however, the analysis in those cases was based on federal constitutional principles and, thus, to this extent is no longer valid under the holdings of *Trombetta* and *Youngblood. Straka*, 116 Wn.2d at 883. In order to be revived, *Vaster*'s "reasonable balance" test must be supported by an independent state constitutional analysis.

In *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), we enumerated six nonexclusive neutral criteria that must be addressed before we will engage in state constitutional analysis: (1) the textual language of the

state provision; (2) significant differences in the federal and state texts; (3) state constitutional history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest or local concern.

Const. art. 1, § 3 provides:

> No person shall be deprived of life, liberty, or property without due process of law.

This language is nearly identical to the federal provision, and no legislative history indicates that the state provision should be interpreted differently. Although our constitution may generally provide more protection than the federal, we must analyze each particular issue individually.

■ Defendants rely primarily on factors 4 and 6. First they argue chemical breath testing is strictly a matter of local concern because the State is charged with developing testing and maintenance procedures for the DataMaster. Law enforcement, however, is always a matter of local concern. Defendants have failed to demonstrate how the State's involvement in administering the breath testing program and enforcing our DWI laws relates to our inquiry of whether the preservation of potentially exculpatory evidence is a matter of particular state interest or local concern. Although they point to other jurisdictions that have rejected the *Youngblood* analysis under their state constitutions, we are not persuaded that the preservation of potentially exculpatory evidence is of particular local interest in Washington. This factor does not further our analysis of the particular question in this case.

Next, Defendants rely on preexisting case law in Washington to argue that we should retain the standard adopted in *State v. Vaster, supra.* Under *Vaster* a criminal defendant must show that there is a reasonable possibility the unavailable evidence would affect the defense. The court must then balance this possibility against the ability of the State to preserve the evidence, the nature of the evidence and the circumstances surrounding its loss. *Vaster*, 99 Wn.2d at 52.

Neither *Vaster* nor the cases cited in *Vaster*, however, included analysis of state law, and, as noted earlier, the federal principles applied in *Vaster* have been supplanted by the holdings in *Trombetta* and *Youngblood*. *See Straka*, 116 Wn.2d at 883; *Ortiz*, 119 Wn.2d at 303-04.

The defense also argues that, given the unique nature of DWI cases, we should place a heightened duty on the State to preserve evidence that could be used in a DWI defense. In their support, the Defendants cite to cases involving a DWI defendant's right to counsel. These cases, however, analyze the right to counsel not only under the constitution, but also under the preexisting state court rule JCrR 2.11. *See Spokane v. Kruger*, 116 Wn.2d 135, 142, 803 P.2d 305 (1991); *State v. Fitzsimmons*, 94 Wn.2d 858, 620 P.2d 999 (1980) (*Fitzsimmons* II); *State v. Fitzsimmons*, 93 Wn.2d 436, 610 P.2d 893, 18 A.L.R.4th 690, *vacated and remanded*, 449 U.S. 977, *aff'd on remand*, 94 Wn.2d 858, 620 P.2d 999 (1980). Because any independent state analysis is based on the existence of former JCrR 2.11, these cases shed no light on any preexisting law regarding the state due process clause and are not helpful in this case.

We are not convinced separate and independent state grounds exist to support a broader interpretation of the state due process clause in the context of preservation of evidence. We hold *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988) provides the proper standard for preservation of exculpatory evidence, and under our analysis above, we find no due process violation. Accordingly, we reverse the District Court's suppression order and reinstate the DWI charges under RCW 46.61.502(1).

STATE EX REL. DAWSON V. SOUTH DIST. COURT

The second case before us represents over 270 DWI cases consolidated in Snohomish County South District Court. In each of those cases, the Defendants underwent DataMaster breath tests, the results of which were suppressed on both constitutional and statutory grounds. On appeal in Snohomish County Superior Court, the District Court's suppres-

sion orders were reversed and the DWI charges were reinstated. The Defendants appealed, and we review this case on certification from Division One. We affirm the Superior Court on all grounds.

First we address the trial court's suppression of the Data-Master results on the ground that the State violated the Defendants' due process rights by failing to generate and preserve certain DataMaster maintenance and repair records. The records requested by the defense in this case are essentially the same as those requested in *Matthews*. We refer to our due process analysis in *Matthews* and, for the reasons stated above, we find the records are not material exculpatory evidence and should not be suppressed absent a finding of bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988).

The evidence of bad faith presented in this case differs from that presented in *Matthews*, but it is equally unconvincing. First, the Defendants point to the State's mishandling of certain maintenance and repair records that should have been available to them in this case. The issue, however, of whether existing records contained incorrect information or were improperly withheld from the defense is completely separate from our inquiry here whether the State acted in bad faith by failing to generate and preserve the records requested by the defense in this case.

The Defendants also argue that the State acted in bad faith because the State knew the exculpatory value of the records at the time it elected to no longer maintain them. They urge us to find that the State's change in record-keeping policy was motivated by a desire to obtain speedier DWI convictions by depriving defendants of exculpatory evidence. Our review of the record, however, reveals no indication that the State has deliberately hampered the Defendants' ability to defend their DWI charges. In fact, given the current breath testing technology, we find the records at issue here have little exculpatory value, and the State has acted reasonably in eliminating certain records to reflect the changes in breath testing technology. Because the previously used

Breathalyzer machine did not possess the technological capability of monitoring its performance at each breath test, more records were previously needed to assure the machines were providing accurate breath alcohol measurements. The State Toxicologist has since exercised his delegated authority to approve an instrument and devise testing protocols that render the maintenance and repair records requested by the defense of little value. The DataMaster performs a control test of a simulator solution each time a breath test is administered, the results of which are printed on the breath test ticket. The breath test ticket, then, is a crucial document in determining whether the DataMaster was operating properly during a particular test, whereas the repair records requested by the defense would only be indicative of how a machine was functioning at a time other than while a particular test was being conducted. There is no substantial evidence that the State believes the maintenance and repair records no longer generated would exculpate the defendants. Rather, the evidence in the record indicates that the records currently maintained by the State provide adequate documentation of the reliability of the DataMaster machines. We find no due process violation.

Next, we address the District Court's suppression of the breath test results under CrRLJ 6.13(c). CrRLJ 6.13 governs the admissibility of certain documents in criminal prosecutions and under section (c), the State may use a certificate instead of live testimony to establish that the breath test machine performing the test was examined, tested, and found to be in working order by a technician. CrRLJ 6.13(c) provides in pertinent part:

(1) . . . In the absence of a request to produce [a state technician or expert witness] . . ., certificates [stating that the breath test machine was in working order] are admissible in lieu of a state expert witness in any [DWI] proceeding. . . ..

(2) . . . If the technician determines that . . . a BAC Verifier DataMaster instrument is not in proper working order at the time of examination, the technician shall [certify that the machine was not in proper working order and certify the date it was repaired].

(3) . . . The clerk of each court of limited jurisdiction shall maintain the certificates as a public record.

Subsections (1) and (2) include sample forms to be filled out by the state technicians inspecting the machines.

The District Court interpreted this rule as placing an affirmative duty on the State to fill out and file a certificate of nonworking order each time a DataMaster is examined and found to be in need of repair. Because the State could not produce CrRLJ 6.13(c)(2) certificates on the DataMasters used to test the Defendants in this case, the District Court suppressed the results of breath tests performed by the DataMasters. We find, however, that CrRLJ 6.13(c)(2) certificates have been rendered somewhat superfluous and that the State's failure to file them should not result in suppression. Therefore, we hold the District Court's suppression of the breath tests on this ground is in error.

The defense agrees that certificates of working order under section (c)(1) are clearly discretionary and need only be used when there is no live testimony. The defense asserts, however, that the language of section (c)(2) requires the State to file certificates of nonworking order regardless of whether the State plans to use live testimony at trial. We cannot agree with this interpretation. Nowhere in CrRLJ 6.13(c) is the State expressly directed to file certificates of nonworking order each time a breath test machine needs to be repaired. Rather, section (c)(2) directs an inspecting technician to fill out a form and certify when the malfunctioning machine was repaired, and section (c)(3) directs the clerk of the court to maintain the certificates as a public record. The rule is ambiguous as to whether the section (c)(2) certificates need only be filed when used in lieu of live testimony as the section (c)(1) certificates.

■■ Court rules are interpreted as if drafted by the Legislature. *State v. Brown*, 111 Wn.2d 124, 154, 761 P.2d 588 (1988), *adhered to on rehearing*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989). We must construe court rules consistent with their purpose. *See PUD 1 v. WPPSS*, 104 Wn.2d 353, 369, 705 P.2d 1195 (1985).

Accordingly, the spirit and intent of the rule should take precedence over a strained and unlikely interpretation. *See Morris v. Blaker*, 118 Wn.2d 133, 143, 821 P.2d 482 (1992).

▮▮ CrRLJ 6.13(c) was adopted when the former WAC 448--12-010 was in effect. Under former WAC 448-12-010 to -020, proper working order of the Breathalyzer machines was determined through examination and certification of the Breathalyzers every 3 months. We find that CrRLJ 6.13(c) was clearly intended to interact with the WAC certification requirement and provide a uniform standard by which documentation of these certification inspections could be deemed admissible in court. Under this view, the use of CrRLJ 6.13(c)(2) certificates, like the use of section (c)(1) certificates, would be entirely discretionary.

The Defendants, however, cite a CrRLJ 6.13 task force comment that may indicate an additional purpose of section (c)(2) certificates was to provide notice to defendants that a machine was malfunctioning during a specific period of time. Even if notification was the original intent of the rule, however, such notice is no longer needed under the current breath testing program. At the time CrRLJ 6.13(c) was drafted, breath alcohol analysis was performed by the Breathalyzer machines. Former WAC 448-12 required Breathalyzer control test results to be recorded only once every 3 months during the certification process to determine the proper working order of the Breathalyzer. WAC 448-12 has since been repealed and replaced with WAC 448-13, under which the proper working order of the DataMaster is determined and recorded at the time of each breath test. WAC 448-13-060. The certification requirement has been dropped and use of CrRLJ 6.13(c) certificates recommended but not required as part of the annual QAP inspection of the DataMasters under WAC 448-13-010.

We refuse to adopt the District Court's strained conclusion that the State's failure to file CrRLJ 6.13(c)(2) certificates should result in the dismissal of all DWI cases. Given the breath testing protocol and procedure currently in place, we cannot say that the Defendants have been prejudiced by the

lack of the section (c)(2) certificates in this case. Considering the initial purposes of CrRLJ 6.13(c)(2) certificates of nonworking order and the evolution of our state's breath testing program, we find the District Court's interpretation violates the spirit and intent of CrRLJ 6.13(c)(2). Therefore, we hold that the State's failure to file a certificate of nonworking order does not require suppression of the breath test results.

We next examine the Defendants' argument that their breath tests were correctly suppressed by the trial court because the tests were conducted on DataMasters operating with software that was improperly authorized by the State Toxicologist. The Defendants challenge the Toxicologist's approval of the DataMaster software as arbitrary and capricious, alleging the tests performed by the Toxicologist on the software before approval were inadequate. We disagree.

▮▮▮▮ Administrative action is arbitrary and capricious only when it is willful and unreasoning or taken without consideration and in disregard of the facts. *See State v. Ford*, 110 Wn.2d 827, 830-31, 755 P.2d 806 (1988) (holding the toxicologist's initial approval of the DataMaster machine was not arbitrary and capricious). A regulation that is authorized and consistent with the authorizing statute is presumed valid, and the party attacking the regulation has the burden of rebutting this presumption. *Ford*, 110 Wn.2d at 831-32.

Two statutes are relevant. First, in former RCW 46.61.502(1), the Legislature has determined that a person is guilty of the crime of DWI while "[t]he person has 0.10 grams or more of alcohol per two hundred ten liters of breath, as shown by analysis of the person's breath made under RCW 46.61.506 . . .". Second, in RCW 46.61.506(3), the Legislature has delegated to the State Toxicologist the responsibility for approving methods for performing the breath analysis and determining a valid breath test.

▮▮▮ As directed by the Legislature, the Toxicologist approved the software currently used in the DataMaster machines. While the Defendants point to weaknesses in the procedures used by the Toxicologist when he was testing the

software, the critical fact remains that he did, in fact, *approve* the software. *Cf. State v. Straka*, 116 Wn.2d 859, 874, 810 P.2d 888 (1991). We find the Toxicologist's approval of the software is consistent with the authorizing statute. Further, our review of the record reveals the software is currently performing accurate and reliable chemical breath analysis. The Defendants fail to demonstrate his approval of the DataMaster software rises to the level of arbitrary and capricious action.

■ Also pursuant to RCW 46.61.506(3), the Toxicologist has approved regulations and protocols which must be followed in order for a breath test to be considered valid. *See* WAC 448-13. Without citation to authority, the Defendants contend that these regulations violate both the confrontation clause and separation of powers principles. These arguments have no merit. Again, the Toxicologist has developed Washington's breath testing program and has promulgated WAC 448-13 at the direction of the Legislature. These regulations do not unconstitutionally hamper the defendant's ability to attack the accuracy and reliability of the evidence at trial, nor do they limit the court's ability to evaluate the admissibility of evidence. The trial court retains the responsibility of determining if the State has met its burden of establishing the foundational requirements for admissibility under *State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960).

Finally, we reject the Defendants' assertion that the DataMaster breath test should be suppressed because the Toxicologist and the State Patrol did not comply with RCW 42.17.290, Washington's public records act. The record contains no evidence that the Defendants have pursued an appropriate remedy under the statute. *See* RCW 42.17.340. This issue is not properly before the court.

For the reasons stated above, the Superior Court's decision to reinstate the DWI charges is affirmed.

### STATE v. WITTENBARGER

The third case before us involves several DWI Defendants whose cases were consolidated in Cascade District Court.

The District Court suppressed the Defendants' DataMaster breath test results and ordered their cases dismissed under RCW 46.61.502(1). On the State's appeal, the Superior Court reversed and remanded for trial. The Defendants were then granted discretionary review in Division One of the Court of Appeals, after which their case was certified to this court and linked with the other cases in this opinion.

The District Court's suppression rested on two grounds. First, the District Court held the breath tests were inadmissible for lack of foundation. The Superior Court reversed on RALJ appeal, finding the breath test results would be admissible if the State could establish on remand that the existing procedures and protocol were followed in evaluating the DataMaster machines. We affirm. Second, the court held the State's failure to preserve DataMaster maintenance and repair records violated the Defendants' due process rights. Again, the Superior Court reversed. As in *State ex rel. Dawson v. South Dist. Court*, we affirm this reversal, relying again on our analysis in the first case of this opinion, *State v. Matthews*. The Defendants' arguments that their due process rights were violated are virtually identical to the arguments made by the Defendants in the previous two cases. Because we have already considered the relevant due process arguments then, we only briefly outline our reasoning here.

In short, the Defendants in this case requested certifications, CrRLJ 6.13 certificates, and other unavailable maintenance and repair records, claiming that these documents were necessary to their defense. As with the documents requested by the Defendants in *Matthews*, however, we find these records do not constitute "material exculpatory evidence" because they are not directly related to the guilt or innocence of a particular DWI defendant and because the Defendants have available alternative means of attacking the credibility of the test results. *See State v. Straka*, 116 Wn.2d 859, 885, 810 P.2d 888 (1991); *California v. Trombetta*, 467 U.S. 479, 489-90, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d

281, 109 S. Ct. 333 (1988). Therefore, under *Arizona v. Youngblood, supra*, suppression is not required absent a showing of bad faith. Again, we have examined the record and have encountered no new or convincing evidence that the State acted in bad faith when it changed its record-keeping policy and eliminated these records. Accordingly, we find no due process violation.

■■■ Next, we examine the District Court's holding that the Defendants' DataMaster test results are inadmissible for lack of foundation under *State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960). Recently in *State v. Straka, supra*, we addressed this issue and found that when the State relies on results of machine breath tests in DWI prosecutions, the State must establish (1) that the machine was in proper working order, (2) that if chemicals were used in testing they were correct and correctly used, (3) that the operator was qualified and performed the test correctly, and (4) that the results are accurate. *Straka*, 116 Wn.2d at 874-75 (citing *State v. Baker, supra*). If the State satisfies this initial burden, the test results are admissible. If the defendant presents rebuttal evidence, the issue of the reliability of the test results is for the trier of fact. *Straka*, 116 Wn.2d at 875.

Analyzing the first prong of this test, the District Court held that without the unavailable maintenance and repair records, the State could not possibly establish that the Data-Masters were in proper working order. The District Court was also disturbed by a record of some "unauthorized tests" run on the DataMasters, which consisted of sample tests conducted by an unknown operator. The court found that the State must recertify the DataMaster machine after such unauthorized contacts in order to establish the DataMaster was in proper working order and lay an adequate foundation for the breath test results.

■■■ We find this conclusion to be in error and in direct conflict with our opinion in *State v. Straka, supra*, where we stated:

> When the [breath testing] protocols at issue here and existing Code provisions are followed, there is sufficient assurance

of accuracy and reliability of the test results to allow for general admissibility of [DataMaster] test results. . . .

*Straka*, 116 Wn.2d at 870.

At all times relevant to the suppression hearings in this case, the current WAC provisions had not yet been enacted. Former WAC 448-12 governed the approval of the DataMaster and the administration of the breath test. While former WAC 448-12-015 and -016 required periodic evaluation and certification of the Breathalyzer machines, WAC 448-12-210 and -220 did not require a similar certification process for the DataMaster machines, presumably because DataMaster machines possess the ability to perform and record the results of a control test each time a breath test is administered.

We find the District Court's decision to suppress the breath test results for lack of foundation to be an abuse of discretion. The existing WAC procedures and protocol (the same provisions that were in effect in *Straka*) did not call for certification of the DataMaster machines and clearly did not call for recertification after each so-called unauthorized contact. Even under the current provisions there is no such requirement. Furthermore, there was no evidence before the District Court that the unauthorized contacts in any way had a negative impact on the DataMaster machines.

We agree with the Superior Court's conclusion that if the State can meet its initial burden and establish it followed the approved protocol, the breath tests are to be admitted. Evidence of the unauthorized contacts could be used by the defense as rebuttal evidence to attack the credibility of the breath test results.

The Superior Court's ruling reversing the District Court's suppression order and dismissal under RCW 46.61.502(1) is affirmed.

ANDERSEN, C.J., and BRACHTENBACH, DURHAM, GUY, and MADSEN, JJ., concur.

JOHNSON, J. (dissenting) — If the majority is willing to convict DWI defendants solely on the "testimony" of a machine, it should provide a method to ensure the machine operates correctly. Yet, notwithstanding the wealth of evidence present in the record relating to machine errors, unauthorized machine contacts, and overall DataMaster accuracy, the majority places almost no burden on the State to prove the BAC DataMaster Verifier (DataMaster) machines do, in fact, yield correct results.

The majority confuses a "valid" test result with one that is accurate and reliable. The majority presumes if the Data-Master spits out a number, that number is correct. Only by ignoring the record can the majority make this gigantic leap of faith. As forensics expert Dr. Richard Jensen explains:

> [A] test may be "valid" ie; properly performed and completed, based upon [the State Toxicologist's] subjective criteria, but still be inaccurate and unreliable. One must necessarily look to the evidence extrinsic to the breath test document to consider the latter question, evidence which is not being preserved under the program currently in force in Washington.

Declaration of Richard E. Jensen, Ph.D., in Response to State's "Clarifying" Affidavits, at 7-8.

Rather than requiring the necessary extrinsic evidence, the majority instead accepts a "self-certifying" breath test ticket as the sole proof of reliability and accuracy, and denies the defense any means of challenging this automated justice dispenser. I reject this approach because it is patently unfair and because it violates the due process clauses of the state and federal constitutions.

At issue is whether a criminal defendant's constitutional due process right to a fair trial is violated by the State's failure to maintain repair and maintenance records on the machines used to measure breath alcohol. In Washington, destruction of evidence cases have been governed by a 2-part test that weighs the likelihood the destroyed evidence would have been exculpatory against the ability of the prosecution to have preserved the evidence. *State v. Vaster*, 99 Wn.2d 44,

659 P.2d 528 (1983); *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976).

The majority rejects this well-established test in favor of the federal analysis adopted in *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), and *California v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984), and concludes the State's failure to preserve the evidence does not violate Defendants' due process rights. I disagree with this result because the majority has incorrectly analyzed the state constitutional issue under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), and because the *Youngblood* and *Trombetta* standard does not provide adequate due process protection as interpreted by this court.

I

The outcome of these cases is controlled by the well-established "reasonable balance" test of *Vaster* and *Wright*. The majority rejects this analysis because it erroneously concludes these cases are no longer valid in light of *Youngblood* and *Trombetta*. The majority contends *Vaster* and *Wright* are not state constitutional cases because they rely on federal law. I disagree. *Vaster* and *Wright* are still good law.

Neither *Vaster* nor *Wright* relies on federal law or cites specifically to the federal constitution. Rather, the cases evaluate both federal cases and cases from other jurisdictions, and, from these cases, form an independent due process test for destruction of evidence cases. Citations to federal cases are not determinative on the issue whether a case is decided on state or federal constitutional grounds. This court often looks to federal cases as persuasive authority on state constitutional issues, even though these cases are not controlling. *See Rozner v. Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991) (although not controlling, federal due process decisions are afforded great weight).

*Vaster* in particular makes it clear this court felt unconstrained by federal law, and instead developed a test which provided more protection for this state's citizens than does

the federal constitution. Discussing its earlier decision in *Wright*, the *Vaster* court explained:

> Unlike other jurisdictions which have focused on the good or bad faith of the prosecution in destroying the evidence, we preferred to adopt the second *Agurs* standard and look to the *reasonable possibility* that the destroyed evidence was material and favorable to the defendant. *See Wright*, at 792.

(Footnote omitted.) *Vaster*, 99 Wn.2d at 50. As an example of another jurisdiction's analysis rejected by the court, the *Vaster* court cited to *United States v. Augenblick*, 393 U.S. 348, 21 L. Ed. 2d 537, 89 S. Ct. 528 (1969), a Supreme Court decision adopting a good faith/bad faith approach when evaluating the suppression of certain evidence.

Because *Vaster* and *Wright* are still good law, it is unnecessary for the majority to apply the *Gunwall* analysis. The purpose of *Gunwall* is to determine whether the Washington Constitution provides a level of protection greater than the federal constitution in a given case. *Gunwall*, 106 Wn.2d at 61. Surely we are not, however, required to revisit each of our state constitutional cases decided prior to *Gunwall*. Here, the constitutional question has already been answered. *Vaster* and *Wright* articulate a separate test from the federal cases they cite and they provide greater protection than the federal constitution. Most important, however, is that the *Vaster* and *Wright* "reasonable balance" test is well established, workable, and familiar to trial courts in this state. There is no reason to abandon this test in favor of *Youngblood*'s less protective "bad faith" standard.

Even if an independent state constitutional analysis is reached under *Gunwall*, the same result would be attained. In *State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992), the dissent argued, under *Gunwall*, that the *Vaster* test is the proper standard to apply in destruction of evidence cases. *Ortiz*, 119 Wn.2d at 316-20 (Johnson, J., dissenting). I adhere to those arguments and raise only a few additional points regarding the majority's analysis.

The Defendants here rely on *Vaster* and *Wright* as preexisting state law in support of an independent state con-

stitutional analysis. The majority again rejects these cases, however, because they do not expressly include an analysis of the state constitution. This approach misconstrues the analysis underlying *Gunwall*'s fourth factor. "Factor four requires us to examine preexisting state law to determine what kind of protection this state has historically accorded the subject at issue". *State v. Young*, 123 Wn.2d 173, 179, 867 P.2d 593 (1994) (citing *Gunwall*, 106 Wn.2d at 61-62). *Gunwall* and its progeny do not limit our inquiry under this factor to only those cases engaging in a lengthy state constitutional analysis. *Gunwall* itself is significantly more broad. It directs courts to examine "[p]reviously established *bodies of state law, including statutory law* . . .". (Italics mine.) *Gunwall*, 106 Wn.2d at 61. The purpose of this factor is to permit courts to evaluate the importance of the particular right being asserted in light of this state's unique legislative and common law background.[1]

Here, the majority fails to recognize that cases decided prior to *Gunwall* are not likely to engage in the same highly structured state constitutional analysis as would post-*Gunwall* cases. This does not mean these cases do not reflect particular state interests. *Vaster*'s "reasonable balance" test embodies this State's strong interest in preserving a crimi-

---

[1]*State v. Boland*, 115 Wn.2d 571, 800 P.2d 1112 (1990) illustrates the breadth of analysis under factor four. In *Boland*, the defendant argued the warrantless search of his garbage, located in trash cans placed on the curb for collection, violated the fourth amendment to the United States Constitution and Const. art. 1, § 7. Because the United States Supreme Court had recently held that such a search did not violate the federal constitution, the *Boland* court limited its analysis to the Washington State Constitution, using the six *Gunwall* factors. *Boland*, 115 Wn.2d at 575. *See California v. Greenwood*, 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988).

Applying factor four, preexisting state law, the court examined two local ordinances controlling trash disposal. The first, a Port Townsend ordinance, prescribed where to place trash cans for municipal pickup. *Boland*, 115 Wn.2d at 576. The second, a Seattle ordinance, made it "unlawful for anyone other than the owner of the trash can, or one authorized by the owner to place objects in the can, to remove its contents 'except for collection.'" *Boland*, 115 Wn.2d at 576 (quoting in part Seattle Municipal Code 21.36.100). Relying on these two ordinances, neither of which addressed a state constitutional basis, the court inferred an expectation of privacy in one's own garbage and found the required support under factor four to review the case on independent state grounds.

nal defendant's constitutional due process right to a fair trial.

Under *Vaster*'s "reasonable balance" test, a court evaluates destruction of evidence cases by weighing the exculpatory potential of a piece of lost evidence against the State's ability to preserve that evidence. Applying the *Vaster test* in these cases, I would find Defendants' due process rights were violated by the State's failure to preserve the maintenance and repair records.

*Vaster*'s first prong requires us to determine if there was a reasonable probability the missing evidence would have been exculpatory. The trial court in *State v. Wittenbarger*, Snohomish Cy. cause 91-2-01742-3, specifically found a reasonable probability exists that the records of voltage values, calibration factors, machine malfunctions, complaints by operators, and the records of repairs affect a person's ability to defend against a DWI charge. The trial court further found a repair record is an important document in the evaluation of the accuracy of a machine.

The majority suggests the "repair and maintenance records would *merely* be used by the defense to discredit the general reliability of the DataMaster results". (Italics mine.) Majority, at 476. Precisely! When the prosecution's case depends upon a single number, the exculpatory value of these records lies in their ability to cast reasonable doubt upon the accuracy of the prosecution's evidence. The expert testimony establishes the DataMaster is capable of completing a test, and, yet the result may be inaccurate and unreliable. That these records have been used successfully in the past to raise this doubt is ample proof that there is, at least, a "reasonable possibility" the maintenance and repair records would have proven exculpatory.

Finding a reasonable possibility the evidence would have been exculpatory, *Vaster* next requires us to weigh that possibility against the State's ability to have preserved the evidence. This factor overwhelmingly supports finding a due process violation in these cases. *The State had every ability to preserve the maintenance and repair records with little if*

*any added effort.* The State did, in fact, maintain these records for many years, and it took an overt policy change to prevent the State from continuing to maintain these records.

In light of the strong possibility the repair and maintenance records would have proved exculpatory, and the relative ease with which the State could have maintained these records, I would hold the State's failure to do so violates the Defendants' due process rights under article 1, section 3 of the Washington State Constitution.

## II

The majority erroneously rejects the Defendants' state constitutional analysis, and thus analyzes these cases under federal constitutional law. Because *Vaster* and *Wright* are still good law and provide more protection than the federal constitution, it is unnecessary to engage in a federal constitutional analysis. I only do so here because I believe the majority has incorrectly applied the federal due process test in these cases.

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness". *Trombetta*, 467 U.S. at 485. This standard of fairness requires that the State afford criminal defendants a meaningful opportunity to present a complete defense. *Trombetta*, 467 U.S. at 485. The State has a duty to disclose material exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Alternately, the State violates a criminal defendant's due process rights when it fails to preserve material exculpatory evidence, regardless of whether the State acted in good or bad faith. *Arizona v. Youngblood*, 488 U.S. at 57.

In recent years, two United States Supreme Court cases have shaped the test to determine whether the government's failure to preserve the evidence violates a defendant's right to due process. In *Trombetta*, the Court held the government violates the defendant's right to due process if the evidence

possessed "exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means". *Trombetta*, 467 U.S. at 489.

Later, in *Youngblood*, the Court added the caveat that when the evidence sought by the defense is not "material exculpatory" evidence, but is nonetheless potentially useful to the defense, the defendant must demonstrate the police acted in bad faith in failing to preserve the evidence. *Youngblood*, 488 U.S. at 57-58.

Although the majority articulates substantially the same federal test, it dances around these due process requirements, and ignores the central premise that the State must afford criminal defendants a meaningful opportunity to present a complete defense. *Trombetta*, 467 U.S. at 485. I would find the State's failure to generate maintenance and repair records violates the requirements of both *Youngblood* and *Trombetta*.

## A

First, under *Youngblood* it would be difficult to imagine a clearer case of bad faith on the part of the government. The records in the proceedings below are replete with testimony from state officials who admitted they understood the importance of this testimony to the defense bar. Dr. Logan, the State Toxicologist, testified he was aware that defense attorneys were successfully challenging breath tests using repair and maintenance history of the DataMaster. He further indicated he viewed his role as helping prosecutors perform better in court against a vociferous defense bar.

Yet, by failing to maintain repair and maintenance records, the State systematically and intentionally established a policy that deprives the defense of a means of challenging the DataMaster test results. Ms. Carol Murren, the defense expert, testified the maintenance and repair records provide significant information about problems with the machines, and are necessary to provide an independent

assessment of the accuracy of the tests. Defense expert Dr. Richard Jensen likewise explained that the repair and maintenance records, such as the telephone complaint records and the technician's diagnosis of observed malfunctions, "contain essential information in considering the accuracy and reliability of a breath test . . . [because] they contain the actual, immediate observations of the malfunction by the person viewing it *at the time it happens"*. Declaration of Richard E. Jensen, Ph.D., at 5. Moreover, the State prevents anyone not employed by the Washington State Patrol from either inspecting the machines or becoming certified to operate them. In contrast, the State Toxicologist's office does certify people outside of law enforcement to test and analyze blood samples.

The State's actions are an indefensible attempt to streamline DWI prosecutions by eliminating the defenses' tools. I would agree with the lower courts, none of which had any trouble finding bad faith on these facts:

> In the present case the facts indicate that the only logical conclusion is that the Washington State Patrol has simply decided that it will not be a part of any effort to tarnish the reputation of its BAC machine. It has done so by systematically reducing the *number of complaint and repair/adjustment records* maintained on the BAC machine, as well as not allowing anybody outside of law enforcement to become a qualified/ certified operator and thus . . . be able to run a subsequent comparison test as contemplated by RCW 46.61.506(5).

Cascade Dist. Court Dec. 6094185, at 12 (Mar. 11, 1991); Opening Br. of Pet'r (Wittenbarger) attach. A.

Likewise, in *State v. Matthews*, the court found:

> The systematic elimination or failure to preserve certain records amounts to destruction of 'material' evidence and was done in 'bad faith', i.e. with knowledge of the potential exculpatory value of the evidence.

King Cy. Dist. Court K09034 Order Suppressing Def.'s Breath Test Results, at 2 (Feb. 22, 1993); Br. of Resp't (Matthews) app. B.

The fact the majority finds certain legitimate reasons for the change in policy does not change this result. The repair

and maintenance records sought by the defense are easy to maintain. They have always been maintained in the past. Most importantly, they are of undisputed value to the defense and to the truth-finding function of the court. Under these circumstances, the burden upon the State should be significant to demonstrate why the shift in policy was not an act of bad faith. Instead, the majority accepts wholesale the State's thinly disguised and unsupported rationales, none of which justifies such a dramatic shift in longstanding policies. Majority, at 477-79.

## B

The State's failure to generate maintenance and repair records also violates the requirements of *Trombetta*. Under *Trombetta*, the failure to preserve material evidence violates due process unless the defendant is able to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489. Neither prong of this requirement is satisfied in this case.

The majority contends the Defendants in these cases have ample other means of presenting an adequate defense. This is simply not true. Prior to the 1992 protocol modifications, the defense bar relied heavily on the maintenance and repair records to attack the credibility of DataMaster breath tests. In some of these cases, the defense raised a reasonable doubt in the minds of the jurors as to the reliability of the breath test results.

Here, the majority eliminates this evidence. The defendants now are limited to cross-examining DataMaster operators regarding operator error, to examining experts regarding the DataMaster machines and infrared spectroscopy, and to conducting additional independent breath or blood tests obtained under RCW 46.61.506(5). Majority, at 476. However, with the exception of the expert testimony, none of the evidence described by the majority attacks the reliability of the DataMaster machinery — the touchstone of the defense. A person charged with a DWI can be found guilty if he or she has a breath alcohol test reading of .10 grams or higher.

Former RCW 46.61.502(1). When the State's entire case revolves around a DataMaster test result, a defendant must, by necessity, challenge factors underlying the accuracy of the test. Yet the majority finds no defects in a policy that permits the State to rely on potentially inaccurate results and then systematically eliminate the defense's ability to challenge these results.

Even expert testimony regarding the DataMaster machines is inadequate to establish possible inaccuracies. In *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), two defendants were charged with various offenses related to the manufacture of methamphetamine. Prior to trial, the government destroyed all of the laboratory equipment it seized it connection with the prosecution. The defendants argued the destroyed equipment was critical to their defense, alleging the laboratory equipment was physically incapable of producing methamphetamine, and the destroyed equipment would have established their innocence. Relying on *Trombetta* and *Youngblood*, the District Court dismissed the prosecution.

On appeal, the government challenged the District Court's determination that the defendants could not reasonably obtain evidence comparable in value to the destroyed evidence. *Cooper*, 983 F.2d at 931. The government argued the defendants could rely on experts familiar with the properties of laboratory equipment or, alternatively, could accept a jury instruction giving the defendants the benefit of any doubt. *Cooper*, 983 F.2d at 932.

The Ninth Circuit disagreed, finding, "[g]eneral testimony about the possible nature of the destroyed equipment would be an inadequate substitute for testimony informed by its examination". *Cooper*, 983 F.2d at 932. The court further contrasted the comparable evidence available to the defendants there with the alternate evidence available in *Trombetta*. *Cooper*, 983 F.2d at 932. Because, in *Cooper*, the experts were prevented from examining the actual equipment as they were permitted to do in *Trombetta*, the *Cooper* court found the

experts' testimony did not permit the defendants to present an adequate defense. *Cooper*, 983 F.2d at 932.

Here, experts for the defense are faced with the same dilemma. They are asked to testify about machinery they are neither permitted to inspect nor even to become certified to operate. The Washington State Patrol allows only law enforcement personnel to operate or inspect the DataMasters and it denies requests by defense experts to access the machines. When defense witness Ms. Murren applied for a permit to operate the DataMaster, her application was denied based upon a "conflict of interest". Murren testified the inability to access the machines limited her expertise and her ability to make informed decisions regarding the accuracy of a particular machine. Given these limitations, the experts' testimony could be no more than mere speculation, and as in *Cooper*, it would be an inadequate substitute for testimony informed by its examination. *Cooper*, 983 F.2d at 932.

The insufficiency of this evidence is further supported by *Trombetta* itself. In *Trombetta*, the Court found the State's failure to preserve the breath samples did not violate the defendants' due process rights, in part, because the defense had access to the calibration records, as well as access to the Intoxilyzer machine itself. *Trombetta*, 467 U.S. at 490. The defendants thus had a means of impeaching the breath test results, other than retesting the original breath samples. Here, defense experts in Washington are prevented from accessing the DataMaster machines or even gaining certification on the machines. Thus, unlike the defendants in *Trombetta*, the Defendants in these cases do not have reasonably available means to obtain comparable evidence, and are thus precluded from mounting an adequate defense.

Our recent decision in *State v. Straka*, 116 Wn.2d 859, 810 P.2d 888 (1991) likewise supports this result. In *Straka*, this court held the State's failure to generate and preserve invalid sample code messages when a breath testing machine was unable to complete a breath test did not violate a defendant's due process rights in part because, "[a] defend-

ant still has the opportunity to attack the test results. Defendant may introduce evidence refuting the accuracy and reliability of the test reading". *Straka*, 116 Wn.2d at 875. That was true, in part, because repair and maintenance records at issue here were still available to the defense in *Straka*. Under the majority's decision today, defendants are effectively precluded from refuting the breath test results based on maintenance and repair records.

Not only does *Trombetta* require that defendants have access to alternate evidence, the opinion also makes it clear that defendants are not expected to jump through numerous hoops, procedural or otherwise, in order to obtain it. Instead, it must be obtainable "by other reasonably available means". *Trombetta*, 467 U.S. at 489.

Here, the opposite is true. The Washington State Patrol has gone out of its way to ensure DWI defendants have no access to useful information. As discussed above, the State Patrol does not permit anyone other than law enforcement personnel to access the DataMaster machines. Nor is anyone other than law enforcement personnel permitted to become certified to use a DataMaster. Thus, notwithstanding the majority's assertion that defendants can present expert testimony regarding the DataMaster machines, majority at 476, there are no real DataMaster experts accessible to the defense, other than those employed by the State Patrol.

In addition, the defense is sent on an apparent wild goose chase when it seeks the few records that are, by law, maintained. WAC 448-13-200 states that certain records are available on request. The only address provided in the WAC's is that of the State Toxicologist's office. WAC 448-13--210.[2] Yet, it is actually the State Patrol that maintains the DataMaster records. The State Patrol, however, seems unwilling to part with the records. In one of the cases below, *State ex rel. Dawson v. South Dist. Court*, Snohomish Cy. cause 92-2-07095-1 (July 9, 1993), Petitioner Church wrote a letter to the State Patrol, attempting to obtain records for a

---

[2]WAC 448-13-210 provides the address for the State Toxicologist regarding inquiries for protocol, procedures, and authorized personnel.

DataMaster machine used in Snohomish County. In response to his letter, Church received form WSP-AS-327, denying Church's request because "[t]he information [Church] requested is available . . . at the South County Law Library". Opening Br. of Pet'r (*State ex rel. Dawson v. South Dist. Court*) Ex. B.

There were, in fact, *no* records available at the law library. During the suppression hearing, the State Patrol first maintained there were no repairs records for the machine in 1992, even though Petitioner Church was directed to the law library to find the requested records. However, on the fourth day of the 7-day suppression hearing, when the records had potential evidentiary value *for the State*, the State Patrol produced the missing records, none of which had been stored in the Snohomish County Law Library. Surely, this conduct cannot comport with due process.

### III

The opinions decided today set a dangerous precedent for a system of automated justice that is not only unfair, it jeopardizes a fundamental constitutional right to a fair trial. The records below establish a critical need for extrinsic evidence of DataMaster machine performance. The truth-finding function of a proceeding must allow for an inquiry into whether a machine was operating correctly when it issued a breath test result. I would find the failure to maintain repair and maintenance records violates due process under the state and federal constitutions, and would affirm the trial courts' rulings suppressing the DataMaster test results.

UTTER and SMITH, JJ., concur with JOHNSON, J.