FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 FEB 12 AM 10: 51

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75546-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCISCO LOPEZ-RAMIREZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 12, 2018 |
| | ) | |

VERELLEN, C.J. — Francisco Lopez-Ramirez was arrested and charged with two counts of indecent exposure at a Seattle college campus. Before trial, the security footage for one of the counts was inadvertently erased, but two witnesses testified about the contents of the missing video, which purportedly showed another suspect. Because Lopez-Ramirez does not establish the missing video was material exculpatory evidence and cannot prove the State acted in bad faith, the trial court properly denied his motion to dismiss based on destruction of evidence.

Lopez-Ramirez moved for a jury drawn from a fair cross section of the community, arguing black residents in King County were underrepresented in jury venires. Because Lopez-Ramirez does not establish the representation is not fair and reasonable in relation to the number of black residents in the community and

that the alleged underrepresentation is a result of systematic exclusion, the trial court properly denied his motion and proposed remedy.

And, contrary to his contention, sufficient evidence supported his conviction on count I.

We affirm.

## FACTS

The State charged Francisco Lopez-Ramirez by amended information with two counts of indecent exposure based on two incidents on February 3, 2016 at the Seattle Central Community College library. Count I occurred around 4:00 p.m. and involved victim Y.M. Count II occurred around 11:00 a.m. and involved victim S.Y. Police arrested Lopez-Ramirez after the second incident (count I), and count II was added once officers realized he was responsible for the earlier offense.

### Count II – 11:00 a.m. Incident

Lopez-Ramirez approached S.Y. in the college library. He sat down at the same table as S.Y. and waved and smiled at her in order to get her attention. S.Y. noticed his zipper was pulled down, his genitals were exposed, and he was masturbating with his hand. S.Y. initially tried to ignore him, but then she quickly gathered her belongings and reported him to the library staff. A still photograph showing the location where S.Y. had been sitting was introduced at trial.

Joel Workinger, a campus security officer, responded and spoke to S.Y., who was upset, shy, and reserved. Workinger and S.Y. returned to the area

2

where the incident took place. S.Y. noticed J.B. in the book rows about 15 to 20 feet from where she had been sitting and told the security officer that he was the offender. She did not come closer to identify J.B. because she was upset and wanted to leave the area. J.B. was arrested based on S.Y.'s positive identification.

Count I – 4:00 p.m. Incident

Later that afternoon, Y.M. sat down in the same library to study and saw Lopez-Ramirez exposing himself. Two surveillance videos, Exhibits 1 and 8, captured his conduct. Exhibit 1 shows him from the front and side, and Exhibit 8 shows him from behind, together with Y.M. and two other women sitting near her.

Exhibit 8 shows Lopez-Ramirez lingering in the entryway to the bathroom, peeking out occasionally or leaving the area when people enter and exit. He eventually sits down in a chair near Y.M.'s table. He gets up a few times to take books from a cart, sits back down, and specifically moves his body to the right so that his groin area faces Y.M. and the two other women sitting nearby. The video shows Y.M. getting up, briefly talking with the other women, then walking away to report Lopez-Ramirez's activities.

Exhibit 1 shows the same sequence of events from the front and side. It shows Lopez-Ramirez moving his hand up and down in his groin area, staring toward Y.M. and two other women. The video shows him continuing this behavior until the security officer approached him. In photographs taken from the security footage, Lopez-Ramirez's penis is exposed.

The following day, college public security director Elman McClain compared the footage from the 4:00 p.m. incident to the video from the 11:00 a.m. incident. He observed S.Y. reporting the 11:00 a.m. incident to library staff, traced her footsteps backward on the video, and noticed Lopez-Ramirez seated next to her just before she reported the incident. He saw J.B. walk past S.Y. but did not show him sitting down near her. McClain immediately called the police to inform them that S.Y. might have misidentified J.B.. J.B. was released, and Lopez-Ramirez was charged with count II.

Lopez-Ramirez had been convicted twice for indecent exposure in 2013, and stipulated to these offenses at trial. A jury convicted Lopez-Ramirez on both counts of indecent exposure. Lopez-Ramirez appeals.

## ANALYSIS

### I. Preservation of Evidence

After campus security and police realized J.B. had been wrongly identified, Officer Malone of the Seattle Police Department requested a copy of all surveillance videos. The college security officer provided a USB storage device with the videos. The campus security recording system automatically overwrites recordings after 90 days. Approximately 96 days later, Officer Malone realized the videos had failed to record on the storage device. Officer Malone asked for a second copy of the videos, but the college was only able to turn over the videos of count I, the 4:00 p.m. incident, not the video regarding count II because police had

not initially asked the college to retain it. Only McClain and Officer Malone saw the video related to count II.

Lopez-Ramirez argues the trial court should have dismissed count II because the State failed to retain material exculpatory evidence, and thus violated his due process rights.

The constitutional right to due process demands fundamental fairness and a meaningful opportunity to present a complete defense.[1] "'To comport with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense.'"[2] Defendants have a right to have material evidence preserved for use at trial.[3]

"The government's failure to preserve *material* exculpatory evidence requires dismissal."[4] Material evidence is "evidence which possesses an 'exculpatory value that was apparent before it was destroyed,' *and* is 'of such a nature that the defendant would be unable to obtain comparable evidence by other

---

[1] State v. Wittenbarger, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994).

[2] State v. Armstrong, 188 Wn.2d 333, 344, 394 P.3d 373 (2017) (quoting id. at 475).

[3] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see Wittenbarger, 124 Wn.2d at 475 (observing that the United States Supreme Court has been unwilling to impose on police "'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution'") (quoting Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

[4] State v. Copeland, 130 Wn.2d 244, 279, 922 P.2d 1304 (1996) (emphasis added).

reasonably available means.'"[5] Where the dispute concerns *potentially useful evidence*, rather than *material exculpatory evidence*, the defendant must show bad faith on the part of the police.[6]

Lopez-Ramirez contends the video of J.B. was materially exculpatory and could not be replaced. We disagree.

Here, Exhibit 8 showed Lopez-Ramirez committing count I, Y.M. testified that the video was accurate, and it showed the defendant sitting near her. As to count II, S.Y. maintained that the man who exposed himself also sat near her. McClain and Officer Malone testified that the lost video showed J.B. walking by S.Y., but did not show him sitting near her. There was no suggestion that the video showed J.B. committing any crime that could be offered to contradict the evidence ultimately presented at trial.[7]

Lopez-Ramirez relies on State v. Boyd, but in that case,

> [t]he first trial ended with the jury unable to reach a verdict. At both trials, there was a substantial dispute as to whether police arrested the correct individual. The jury was confronted with two divergent lines of testimony. There was no tangible or physical evidence directly supporting either version of events.[8]

The dispute as to S.Y.'s initial identification of J.B. was quickly resolved once campus security personnel reviewed the video footage. S.Y.'s description of

---

[5] Id. at 279-80 (quoting Wittenbarger, 124 Wn.2d at 475).

[6] Id. at 280.

[7] See id. ("Also, as the trial court correctly concluded, there was no evidence that any [DNA] retest results would have been exculpatory.").

[8] 29 Wn. App. 584, 590, 629 P.2d 930 (1981).

the suspect's behavior matched Y.M.'s, and the surveillance video produced at trial showing Lopez-Ramirez's behavior strengthened this connection. Unlike in Boyd, the jury here was confronted with a streamlined version of events from the victims, campus security, and law enforcement, and the jury considered evidence showing Lopez-Ramirez was the individual who committed both crimes.

Lopez-Ramirez also suggests State v. Burden is instructive.[9] That case involved a retrial after the first jury could not reach a resolution. Before the second trial, the clerk's office lost the jacket the defendant wore when he was arrested for possessing cocaine. The lost evidence in Burden was "a key piece of evidence."[10] Burden's theory was that the coat did not belong to him and that he did not know drugs were in the pocket.[11] Division Two of this court noted the fit and appearance of the coat were important factors at trial, specifically "[t]he fit of the coat and the name in it raised issues of ownership."[12] The State argued the "tight fit" of the coat proved Burden could feel the paper bag of drugs in the jacket, but admitted the coat had a name in it that was not Burden's.[13] There was also no testimony offered at the first trial regarding "some of the specifics about the coat," because it was physically present as an exhibit.[14] The court agreed with the trial court's

---

[9] 104 Wn. App. 507, 17 P.3d 1211 (2001).
[10] Id. at 512.
[11] Id.
[12] Id. at 512-13.
[13] Id. at 513.
[14] Id.

determination that a substitute coat would "raise credibility issues that would prejudice" the defendant, concluding the coat was material exculpatory evidence and thus not merely "potentially useful."[15] Unlike Burden, the missing video in this case merely placed J.B. at the library walking past S.Y. rather than sitting near her.

Lopez-Ramirez does not establish the missing evidence was material exculpatory evidence and does not offer compelling arguments that the evidence was lost as a result of bad faith.

We conclude the absence of the security footage for count II did not violate Lopez-Ramirez's due process rights.

## II. Fair Cross Section Requirement

Before trial, Lopez-Ramirez filed a motion to form a jury venire from a fair cross section of the community. Lopez-Ramirez's counsel relied upon a 20-day study by a University of Washington professor purporting to show a racial disparity in representation on jury panels. He requested that he be provided demographic information about potential jurors in the jury assembly room so he could fashion a jury based on ethnic makeup. Counsel suggested after the selected jurors were brought to the courtroom, the parties and the court should conduct their "own little census as to who actually shows up and how they look based on how comfortable

---

[15] Burden, 104 Wn. App. at 514.

we are doing that, trying to subjectively guess on the folks cultural or ethnic background."[16] The court denied the motion in an oral ruling:

> The statistics apparently show that when compared to the number of eligible black citizens in the community the underrepresentation of black jurors may not be unreasonable even assuming there is underrepresentation. This evidence does not establish that the process by which King County summons citizens and potential jurors is a result of a systematic exclusion of black jurors, therefore the defense motion on this record must be denied.[17]

The court also ruled Lopez-Ramirez's proposed remedy was improper for several reasons.

Lopez-Ramirez argues the trial court erred in denying his motion. We disagree.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has a right to "a jury drawn from a fair cross section of the community."[18] "Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial."[19] But defendants are not entitled to "a jury of any particular composition,"[20] and a jury selection process is

---

[16] Report of Proceedings (June 6, 2016) at 73.

[17] Id. at 88-89.

[18] Taylor v. Louisiana, 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

[19] Id. at 530.

[20] Id. at 538.

adequate "so long as it may be fairly said that the jury lists or panels are representative of the community."[21]

To establish a violation of the fair cross section requirement, a defendant must show that "(1) the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in the source from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process."[22]

In Washington, juries are selected according to requirements of statutes and court rules.[23] Our legislature has a "history of revising the methods for compiling the jury lists in an effort to make the pool of eligible jurors more inclusive and representative."[24] Washington's methods of creating a jury list are broader and more inclusive than required by law.[25] In 2005 and 2009, our legislature undertook considerable efforts to expand the category of eligible voters,[26] such as allowing jurors to report to the courthouse closest to their residence and restoring voting rights to convicted felons, thus making them eligible to serve as jurors.

---

[21] Id.

[22] Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

[23] RCW 2.36.054-.065; GR 18.

[24] State v. Lanciloti, 165 Wn.2d 661, 668-69, 201 P.3d 323 (2009).

[25] State v. Cienfuegos, 144 Wn.2d 222, 232, 25 P.3d 2011 (2001).

[26] See Lanciloti, 185 Wn.2d at 664; LAWS OF 2009, ch. 325.

It is undisputed that black residents are a distinctive group in the community, but Lopez-Ramirez does not establish underrepresentation and systematic exclusion.[27]

The challenger must prove "that the representation of the group in venires is not fair and reasonable *in relation to the number of such persons in the community.*"[28] Our Supreme Court has emphasized that merely showing underrepresentation is insufficient.[29] Courts have recognized each method of measuring whether a distinctive group in the jury pool is fair and reasonable has its flaws.[30]

The absolute disparity method examines the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool.[31] Our Supreme Court has used the absolute disparity method and held that a level of underrepresentation greater than that claimed by Lopez-Ramirez was insufficient to support a constitutional violation.[32]

---

[27] In re Pers. Restraint of Yates, 177 Wn.2d 1, 20, 296 P.3d 872 (2013).

[28] Duren, 439 U.S. at 364 (emphasis added).

[29] Yates, 177 Wn.2d at 20-21.

[30] People v. Smith, 463 Mich. 199, 204, 615 N.W.2d 1 (2000).

[31] United States v. Hernandez-Estrada, 749 F.3d 1154, 1160 (9th Cir.), cert. denied, 135 S. Ct. 709, 190 L. Ed. 2d 445 (2014).

[32] Lopez-Ramirez contends the black resident share of the adult population in the Seattle jury assignment area is 4.14 percent, but the black resident share of the jury pool by persons answering the survey during the 20 days was 2.29 percent. In State v. Hilliard, 89 Wn.2d 430, 442, 573 P.2d 22 (1977), the court held that a level of underrepresentation greater than that at issue in this case was insufficient to support a constitutionally significant disparity. In that case, the black

Lopez-Ramirez suggests the comparative disparity method would be more appropriate here, but courts have recognized this method overstates the underrepresentation when used with groups that are a small percentage of the community's population.[33] It is undisputed that the black population in King County is relatively small and, according to the data presented by Lopez-Ramirez, the comparative disparity for black residents in the Seattle jury assignments is 35.5 percent. In dealing with similar population sizes, courts have rejected constitutional claims involving disparities equal to or higher than that offered by Lopez-Ramirez.[34] Lopez-Ramirez does not establish that the underrepresentation is constitutionally unfair or unreasonable in relation to the size of the black population in the community.

Lopez-Ramirez also contends the underrepresentation is the result of systematic exclusion in the jury selection process. Specifically, that the "court does not effectively summons people who live in poorer, more mobile zip codes with more minority residents."[35]

---

resident population constituted 1.3 percent of the jury pool and 4 percent of the county's population.

[33] Hernandez-Estrada, 749 F.3d at 1162; United States v. Weaver, 267 F.3d 231, 242 (3rd Cir. 2001) ("When comparative disparity has been used, it has been emphasized that the significance of the figure is directly proportional to the size of the group relative to the general population, and thus is most useful when dealing with a group that comprises a large percentage of the population.").

[34] Weaver, 267 F.3d at 243; United States v. Orange, 447 F.3d 792, 798 (10th Cir. 2006); United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000); People v. Ramos, 15 Cal. 4th 1133, 1159, 938 P.2d 950 (1997).

[35] Appellant's Br. at 17.

A mere showing of underrepresentation does not establish systematic exclusion of the group in the jury selection process.[36] Systematic exclusion requires blatantly different treatment of underrepresented groups.[37]

Lopez-Ramirez cites cases from other states and federal authority, but they are not compelling in this setting. In view of the Washington legislature and King County's efforts to expand minority participation in jury selection, Lopez-Ramirez fails to establish systematic exclusion.

Lopez-Ramirez's fair cross section challenge fails.

## III. Sufficiency of the Evidence

Lopez-Ramirez argues there was insufficient evidence to show his conduct as to count I was intentionally open and obscene, as required by RCW 9A.88.010. He relies largely on evidence that he attempted to conceal himself.

Under the sufficiency of the evidence test, we examine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilty beyond a reasonable doubt."[38] All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.[39]

---

[36] Duren, 439 U.S. at 366.

[37] See id. ('Such a gross discrepancy between the percentage of women in jury venires and the percentage of women in the community requires the conclusion that women were not fairly represented in the source from which petit juries were drawn in Jackson County.").

[38] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[39] Id.

RCW 9A.88.010(1) provides, in relevant part:

A person is guilty of indecent exposure if he or she intentionally makes any open and obscene exposure of his or her person or the person of another knowing that such conduct is likely to cause reasonable affront or alarm.

"Open" in this setting requires an act "such that the common sense of society would regard the specific act performed as indecent and improper."[40]

Here, the security video shows Lopez-Ramirez intentionally exposing his genitals to Y.M. and two other women. Although he shielded his genitals from individuals walking by, he positioned his body and pelvis so that Y.M. and the two other women would be able to see, and Y.M. did see. The "common sense of society" would regard Lopez-Ramirez's behavior as indecent and improper.

We conclude a rational trier of fact could have found Lopez-Ramirez guilty beyond a reasonable doubt.

We affirm.

WE CONCUR:

_Trickey, J_

---

[40] State v. Eisenshank, 10 Wn. App. 921, 924, 521 P.2d 239 (1974).