IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37990-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CORTNY RAY SCOTT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Cortny Scott was charged with ten counts of child rape and molestation after his stepdaughters came forward with allegations of ongoing abuse. A jury found him guilty of four counts of child rape in the second degree and one count of child molestation in the second degree. Mr. Scott appeals, raising five primary issues: 1) the State violated his due process rights by failing to confiscate a victim's cell phone containing evidence, 2) his trial attorneys were constitutionally ineffective, 3) the trial court made several evidentiary errors related to allegations that one of the victims had been sexually abused as a small child, 4) the evidence was insufficient to support convictions for counts 1 and 2, and 5) cumulative error deprived Mr. Scott of a fair trial. Procedurally, Mr. Scott contends that the judgment and sentence and warrant of commitment contain scrivener's errors and need to be corrected upon remand. He raises

a handful of errors in his statement of additional grounds. Finding no substantive errors, we affirm Mr. Scott's convictions and remand to correct the record.

FACTS

Cortny Scott began dating Wendy Scott in 2014. In December 2014, he moved in with Ms. Scott and her two adolescent daughters, TRM and SNM. Cortny and Wendy married in April 2016, and separated on October 6, 2017. When Ms. Scott told her daughters that she was leaving Mr. Scott, they disclosed that Mr. Scott had been sexually abusing them for some time. After hearing the allegations, Ms. Scott took her children to the hospital for an examination and called 911.

A forensic interviewer questioned the children, and SNM submitted to a SANE (sexual assault nurse examiner) medical examination. During her forensic interview, SNM indicated that when Mr. Scott wanted to have sex with her, he would sometimes text her to wake her up early in the morning. Sometimes these texts contained words, and sometimes the texts just included a "dot" or a "period," which SNM took as a message to meet the defendant for sex. A detective was able to find three such text messages on SNM's phone. The detective took photographs of SNM's phone screen showing the texts but did not confiscate the phone.

DNA[1] was collected from SNM during the SANE examination. Two blankets

allegedly used during some of the rapes were also collected and sent for testing.

Before trial, Mr. Scott learned that TRM had alleged prior sexual abuse by her

biological father and stepbrother when TRM was four years old. Defense counsel moved

to admit evidence of these allegations, and the State moved to exclude the allegations as

irrelevant. Defense counsel's theory was that the prior allegations demonstrated a pattern

of making false allegations, but counsel acknowledged that there was no evidence that the

prior allegations were actually false. As the court clarified, defense counsel wanted to

raise the allegations and let the jury speculate. Report of Proceedings (May 23, 2019) at

10. The trial court excluded any mention of the prior allegations and affirmed its ruling

on reconsideration.

In pretrial motions and opening statements, defense counsel indicated that he

expected Mr. Scott to testify. Mr. Scott was expected to authenticate his own phone

records and provide evidence that cell phone applications are available to create fake text

messages.

During opening statement, Mr. Scott's attorney introduced the jury to several

defense theories, including general denial, alibi evidence, and sloppy investigation by law

---

[1] Deoxyribonucleic acid.

enforcement.  Counsel also stated that the victims and their mother were motivated to

fabricate the allegations as revenge for Mr. Scott's infidelities:

> [Defense Opening]:  Should Mr. Scott take the stand, he will be able to tell you that he has a good idea of why he has been falsely accused.  Ms. Scott told him, "I'm going to get you.  I want you dead."  Mr. Scott will tell you, he did not do any of the things the girls said he did.  He never sexually assaulted either of the girls, and he finds the entire thought of doing something like that utterly, utterly derisive, offensive, beneath his core values, and he did not do it.

RP (May 23, 2019) at 34-35.

At the time of trial, SNM was 14 years old.  She testified that on October 6, 2017,

she disclosed to her mother that Mr. Scott had been sexually assaulting her several times

a week for the last several months.  SNM indicated that she felt safe telling her mother at

that time because her mother was leaving Mr. Scott.  SNM indicated the last assault/rape

occurred within a week of telling her mother, but clarified later that it occurred the day

before her disclosure, on October 5, 2017.  She testified that it occurred on the couch in

the family home and Mr. Scott used lubrication and a condom.

She also testified about the first time Mr. Scott had intercourse with her.  She

explained that it occurred in the kitchen sometime after May 2017.  She testified that she

vividly remembers this incident because she cried and it hurt.  When she asked to stop, he

did, "but then something would go missing or broke, and then he would be angry with the

family and it was scary."  RP (May 23, 2019) at 70.

SNM testified that initially the assaults were occurring "every week or so," but after a while, they were occurring three or four times a week. RP (May 23, 2019) at 74-75. They occurred early in the morning or late at night, almost always when her mother and sister were asleep. She recalled having sex in the hallway, several times in her mother's bed when her mom was at work, and two times on the couch, "but it was usually on the floor where it was the first time." RP (May 23, 2019) at 76.

SNM testified that when Mr. Scott wanted sex, sometimes he would come into her room and tell her to come out. A few times he sent her text messages, and other times he would tell her to set an alarm to wake up. She testified that sometimes the texts included words, but over time he would text her "dots" or periods, which meant she should come out of her bedroom. SNM identified two photographs taken by a detective of her cell phone, showing three text messages from Mr. Scott. One photograph showed a text message of "dots" from Mr. Scott to SNM on September 8, 2017, at 3:19 a.m. The other photograph showed a text message from Mr. Scott at 5:36 a.m. that said, "Meet me by the freezer in two minutes." RP (May 23, 2019) at 89. While SNM did not testify as to the date of this message, she did testify that on September 30, Mr. Scott texted her a "dot" at 4:31 a.m. SNM testified that after each one of these text messages, Mr. Scott had sex with her.

SNM's older sister, TRM, also testified that the defendant had intercourse with her on multiple occasions. At the time of trial, TRM was 16 years old. TRM testified that

she was previously in a special needs class, but was currently being homeschooled. Her

mother later testified that TRM had been diagnosed with developmental delays. RP (May

29, 2019) at 760-61. TRM indicated that she struggled primarily with math and reading.

TRM testified that after her sister, SNM disclosed being raped by Mr. Scott, TRM

decided to tell her mother about her own abuse. TRM testified that the first time Mr.

Scott had sex with her was in the bedroom of the "Tolmie cove" house. In describing this

incident, she blurted out a comment that became a significant issue in closing argument:

> [TRM]: And UH, I -- I took my clothes off, AND—
>
> [Prosecutor]: Why did you take your clothes off?
>
> A: Because he wanted me to.
>
> Q. Okay.
>
> A. And he told me not to tell anybody, but first he was laying on the bed and saying, "Please don't tell anybody or I'm going to get in trouble. I don't want that." *This is what my dad used to do.* But—yeah. It was pretty much it.
>
> Q. Okay. Was he wearing any clothes?
>
> A. Uh, yeah. He was.
>
> Q. What was he wearing?
>
> A. Um, I can't remember.

RP (May 23, 2019) at 129-30 (emphasis added). TRM continued to describe Mr. Scott

performing oral sex on her and inserting his fingers into her vagina. She said that when

she left the room she cried, but was afraid to tell anyone.

6

Neither party objected or moved to strike the comment from the record. Nor did defense counsel raise the comment in cross-examination. Later, however, defense counsel sought the court's permission to raise the subject of the prior abuse when questioning TRM's mother, Ms. Scott. The trial court ruled that the comment did not open the door, and its prior order in limine would stand.

TRM continued to testify about different instances of Mr. Scott having sex or sexual contact with her. TRM indicated that the last time Mr. Scott had sex with her was a month after he got caught and "we left the house," but later clarified that it was a month before he got caught. RP (May 23, 2019) at 127.

After TRM testified, trial recessed for the Memorial Day weekend. When it reconvened the following Tuesday, Mr. Scott failed to appear for trial. Mr. Scott texted his attorney that he had been discharged from the hospital that morning and was "asking for is just a bit of time to get myself together. Not well." RP (May 28, 2019) at 549. Otherwise, Mr. Scott failed to indicate when he would be in court and would not answer phone calls or texts from his attorney. The court found that Mr. Scott was voluntarily absenting himself from trial, issued a warrant of arrest, and began the trial in absentia after giving Mr. Scott several hours to appear.

The State presented the testimony of the two nurses who examined SNM. First, the SANE nurse who examined SNM on October 6, 2017, testified that SNM disclosed that within the last 35 hours, Mr. Scott had woke her up and had intercourse with her on

the couch while using a condom.  The nurse took several swabs of fluids from SNM's

genital area that were sent to the crime lab for testing.  The ARNP nurse testified that

SNM's hymen was scarred but could not confirm trauma injury or sexual assault.

Next, the State presented the testimony of two forensic scientists from the

Washington State Patrol Crime Laboratory.  These witnesses testified that Mr. Scott's

semen and DNA were found on the yellow blanket, but not the pink blanket.  The

perineal and vaginal swabs and SNM's underwear tested negative for semen but positive

for low levels of male DNA.  Subsequent Y-STR testing indicated that the DNA sample

from SNM's vaginal swab matched the DNA sample taken from Mr. Scott and

potentially any of his male relatives given the profile frequency.  The crime lab

technician testified on cross-examination that DNA can be transferred by secondary

transfer, including touch and the washing machine.

Wendy Scott testified that she was home, bedridden with a broken leg from

January 2017 to the end of June 2017 and again in September 2017.  RP (5-28-2019) 721,

723.  Both times, she took an oxycodone prescription.  Wendy testified about her

daughter's sexual disclosures.  She was cross-examined about her anger at Mr. Scott for

his affairs and her desire to divorce him.  Wendy testified that TRM had been diagnosed

as developmentally delayed and was cross-examined on that subject.

8

On May 30, 2019, Mr. Scott reappeared in court for his trial. The court found that his two-day absence was voluntary and booked Mr. Scott for violating his release conditions. Mr. Scott remained in custody for the rest of the trial.

Defense counsel called Jennifer Junge as a witness. She testified that she was Mr. Scott's girlfriend from January 2014 to late 2017. They have one child in common. Ms. Junge testified that Mr. Scott stayed at her house every day, Monday through Friday, during those years. She testified that Mr. Scott stayed at her home the week before he was arrested, including the night of October 4 to the morning of October 5. Ms. Junge was not aware that Mr. Scott was married to Ms. Scott and leading a double life. She became aware of the charges after Mr. Scott was arrested.

Mr. Scott also called the HR director from his former employer, who testified that Mr. Scott clocked in to work at 6:00 a.m. on October 5, 2017, and clocked out at 1:30 p.m. that day. On September 8, 2017, Mr. Scott clocked in at 5:42 a.m. There were no records of him working on September 30, 2017.

Mr. Scott also called Dr. Philip Welch, an obstetrician/gynecologist, as an expert witness on forensic examinations. After reviewing the forensic reports on SNM, Dr. Welch did not find any visible or abnormal scarring or evidence consistent with sexual abuse.

On June 4, defense counsel indicated he would not be calling Mr. Scott as a witness.

9

During closing argument, the State focused on the DNA evidence and the victim's testimony. Defense counsel's argument was riddled with objections and arguments outside the presence of the jury. During defense counsel's closing, the jury was excused three times so the court could address the State's objections. At one point, the trial court sanctioned Mr. Scott's attorney for raising the prior abuse allegations. Following this discussion, Mr. Scott's second attorney took over closing.[2]

Throughout closing, defense counsel argued general denial, the burden of proof, the allegations were unreasonable because someone in the house would have heard or seen something, the victims' testimony was inconsistent and not credible, Mr. Scott had established an alibi, the DNA evidence was not reliable and could have been transferred secondarily, and the investigation was sloppy and incomplete.

The jury entered verdicts of guilty on four counts of second degree child rape and one count of child molestation in the second degree, and verdicts of not guilty on the remaining five charges. The judgment and sentence correctly lists Count 6 as child molestation in the second degree pursuant to RCW 9A.44.086 (seriousness level VII) subject to 116 months' confinement and 36 months' community custody. However, the pre-printed form grid contains a maximum term of "life" that was not scratched out even though the proper sentence is handwritten in the grid immediately to the left. The

---

[2] It is not clear from the record whether the switch in attorneys was preplanned or a tactical decision because of the multiple objections.

warrant of commitment attached to the judgment and sentence lists Count 6 as "[Child

Molestation in the first degree]", a class A felony with a maximum term of life, instead of

child molestation in the second degree, a class B felony.  CP 399.

Mr. Scott appeals.

ANALYSIS

A.  SUPPRESSION OF EVIDENCE

In his first issue on appeal, Mr. Scott argues that police had a duty to confiscate

SNM's cell phone and preserve the evidence, and their failure to do so violated discovery

rules and his due process rights.  He contends that the proper remedy for such a violation

is suppressing any evidence related to the cell phone, including the text message

photographs.  Witness SNM told officers that Mr. Scott would sometimes text her to

indicate he wanted to meet her for sex.  Sometimes these texts included specific

messages, and sometimes they simply contained a "dot" or a period.  SNM testified that

she received texts on September 8, and September 30, 2017.  She testified that Mr. Scott

had sexual intercourse with her on each of these dates.

Before trial, Mr. Scott filed a motion to suppress the pictures of the text messages

because the State had not produced the witness's phone for inspection, and the text

messages could not be authenticated.  The State responded that the phone was not in its

possession, and Mr. Scott had not asked the witness for the phone or issued a subpoena

duces tecum.  The trial court noted that Mr. Scott had not filed a motion to compel

discovery and denied the motion to suppress for failure to confiscate the phone and turn it over. The court declined to rule on the authentication issue, reserving it for trial. When the photographs of the text messages were introduced at trial, Mr. Scott did not object.

Before deciding the substantive issue, we must determine the appropriate standard of review. The State contends that Mr. Scott failed to preserve the issue for appeal by failing to object to the admission of the photographs at trial, but the State's argument oversimplifies the issue. From the transcript and the trial court's ruling, it is clear that there were two distinct issues: failure to preserve and turn over possibly exculpatory evidence and the inability to authenticate text messages from a photograph. The trial court denied the first motion and reserved the authentication issue. Mr. Scott is not challenging the evidentiary foundation of the pictures introduced at trial. Thus, Mr. Scott's motion to suppress based on failure to confiscate the phone preserved this issue for appeal.

Mr. Scott argues that the State had a duty to confiscate and preserve the victim's cell phone because it contained materially exculpatory evidence, citing CrR 4.7(a)(3) and *State v. Wittenbarger*, 124 Wn.2d 467, 880 P.2d 517 (1994). Under the Fourteenth Amendment to the United States Constitution and the court rule, the State has a duty to disclose any "materially exculpatory evidence" within the prosecutor's knowledge and preserve such evidence for use by the defense. *Id*. at 475. The due process right is limited, however, and courts have been unwilling to "impos[e] on the police an

12

undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id*. To be considered "material exculpatory," evidence must possess exculpatory value that was apparent before it was destroyed, and be of such nature that defendant would be unable to obtain comparable evidence by other reasonably available means. *Id*.; *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

Under the court rules, the prosecutor also has a duty to disclose and preserve evidence that is material and favorable to the defendant. *State v. Blackwell*, 120 Wn.2d 822, 826, 845 P.2d 1017 (1993). However, this duty is limited to materials and information within the knowledge, possession, or control of the prosecuting attorney's staff. CrR 4.7(a)(4). When others hold evidence, the prosecutor has an obligation to request the materials, but ultimately the trial court has the authority to issue subpoenas to obtain the materials. CrR 4.7(d).

In this case, there is no evidence that any of the text messages had apparent and obvious exculpatory value when viewed by the officer. While Mr. Scott denied sending the texts, this would not be apparent to the officer investigating the case. Nor is there evidence that the text messages on the victim's phone were ever destroyed and no longer available. Finally, there is no indication that the phone and phone records were not

13

reasonably available to Mr. Scott by way of subpoena.[3]  While defense counsel

commented during argument on the motion that "we ask that the telephone be brought in

for examination, for forensic examination," the court noted that Mr. Scott had not filed a

motion to compel discovery.  RP (Jan. 7, 2019) at 6, 12.  Mr. Scott has failed to

demonstrate that the phone and phone records were materially exculpatory or unavailable

through third-party discovery.  Consequently, the State had no duty to confiscate the

phones.  Mr. Scott's remedy was to seek access to the phones through a motion to compel

and third-party discovery.

   B.   INEFFECTIVE ASSISTANCE OF COUNSEL

   Mr. Scott alleges that his trial attorneys were constitutionally ineffective in three

ways: (1) they failed to follow through on a "cohesive theory of the case," (2) they failed

to interview the complaining witnesses and conduct an adequate interview of the

complaining witnesses' mother, and (3) they misstated the law and evidence in closing

argument.

   Criminal defendants have a constitutionally guaranteed right to effective

assistance of counsel.  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v.*

*Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018).  A claim of ineffective assistance of

---

   [3] Defense counsel also indicated pretrial that he intended to discredit the State's evidence with Mr. Scott's phone records, which would be authenticated by Mr. Scott's testimony.  This plan apparently fell through when Mr. Scott chose not to testify.

counsel is an issue of constitutional magnitude that may be considered for the first time

on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007).

Claims of ineffective assistance of counsel are reviewed de novo. *State v. White*,

80 Wn. App. 406, 410, 907 P.2d 310 (1995). Under *Strickland v. Washington*,[4] Mr. Scott

bears the burden of showing (1) that his counsel's performance fell below an objective

standard of reasonableness based on consideration of all the circumstances and, if so, (2)

there is a reasonable probability that but for counsel's poor performance the outcome of

the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334–35,

899 P.2d 1251 (1995). If either element is not satisfied, the inquiry ends. *State v. Kyllo*,

166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record for deficiencies, there is a strong presumption that

counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. The burden is on

a defendant alleging ineffective assistance of counsel to show deficient representation.

*Id*. The reasonableness of counsel's performance is to be evaluated from counsel's

perspective at the time of the alleged error and in light of all the circumstances.

*Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

When counsel's conduct can be characterized as legitimate trial strategy or tactics,

performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

---

[4] 466 U.S. 687, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 180 (1984).

A defendant must affirmatively prove prejudice, not simply show that "'the errors had some conceivable effect on the outcome.'" *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006) (quoting *Strickland*, 466 U.S. at 693). A defendant demonstrates prejudice by demonstrating that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

   1. *Cohesive theory of the case.*

During opening statements, defense counsel suggested that the mother and her daughters fabricated the allegations to get revenge on Mr. Scott for leading a double life with another woman. On appeal, he contends that his attorneys did not mention the theory in closing despite counsel's opening statement and evidence at trial to support this theory.

There were several theories postulated during opening, including that Mr. Scott was not present on the date of an alleged violation, that the investigation was shoddy, and the witnesses were not credible. Some of these theories were developed during trial, and others were not.

In support of his argument that failure to follow a cohesive theory of the case constitutes ineffective assistance of counsel, Mr. Scott cites *State v. Greiff*, 141 Wn.2d 910, 10 P.3d 390 (2000). In *Greiff*, defense counsel was unable to deliver on evidence promised during opening statement because the police officer changed his testimony. *Greiff* argued that the change in testimony, without prior notice, rendered his attorney

ineffective because the attorney was unable to deliver on promised testimony. While recognizing that the irregularities caused by the change in testimony were serious, the court held that a claim of ineffective assistance of counsel could not be based on the failure of a third-party witness. *Id.* at 925.

The holding in *Greiff* does not support Mr. Scott's claim, and Mr. Scott does not cite any other cases to support his argument that the failure to mention one of the many theories of the case in closing argument is objectively unreasonable. In *State v. Israel*, the defendant alleged that his counsel should have made certain arguments in closing. 113 Wn. App. 243, 271, 54 P.3d 1218 (2002). The court held that "the determination of which arguments to advance in closing is a tactical decision susceptible to a wide range of acceptable strategies." *Id.* While the court speculated that counsel's attorney might have seen the omitted argument as weak, or they might not have wanted to invite rebuttal evidence, ultimately, the attorney's reasoning was not in the record. *Id.* Absent some indication in the record that the failure to make the omitted arguments was due to oversight rather than strategy, the court cannot attribute the omission to ineffective assistance below the standard of reasonable professional judgment. *Id.*

In this case, trial counsel's reasons for not mentioning the revenge theory in closing are not in the record. Mr. Scott fails to demonstrate that the failure to mention this theory was an oversight instead of strategic. It is quite possible that Mr. Scott's absence from trial while Wendy Scott was testifying affected counsel's ability to develop

17

this theory. While counsel did not touch on this theory in closing, they did focus on the evidence and lack of evidence introduced at trial. These were strategic decisions made in light of the ever-shifting nature of evidence common in every trial. We do not find the shift in focus at closing to fall below an objective standard of reasonableness.

2. *Failure to Investigate.*

Mr. Scott also alleges that his trial counsel was ineffective by failing to interview the two complaining witnesses and failing to ask enough questions during the mother's interview. Mr. Scott contends that a more thorough interview would have exposed more information relevant to the witnesses' credibility at trial.

The failure to interview a particular witness can constitute deficient performance. *State v. Jones*, 183 Wn.2d 327, 340, 352 P.3d 776 (2015). However, "there is no absolute requirement that defense counsel interview witnesses before trial." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 488, 965 P.2d 593 (1998). A defendant raising a "failure to investigate" claim must show "a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 739, 101 P.3d (2004).

In *Jones*, the court found ineffective assistance of counsel where counsel inexplicably failed to interview several neutral witnesses listed in police reports without knowing what they observed. The witnesses were later found to possess exculpatory self-defense evidence identifying the defendant as the true assault victim. The *Jones* court

18

reasoned that if the decision not to interview witnesses is not informed, the failure to call the witnesses at trial cannot be strategic. Counsel cannot make a reasonable strategic choice without first obtaining sufficient facts on which the decision could be made. *Jones*, 183 Wn.2d. at 341. The question is whether the decision not to interview a given witness was informed and reasonable. *Id.* at 340.

On this issue, Mr. Scott cannot show prejudice because the record on appeal is insufficient. Mr. Scott contends that had his attorney conducted sufficient interviews, he would have uncovered credibility issues as well as more information about TRM's disability. There is nothing in the record on direct appeal to support these allegations. Instead, Mr. Scott's remedy is to bring a personal restraint petition where he can supplement the record. *McFarland*, 127 Wn.2d at 338 n.5.

## 3. Closing argument

Mr. Scott also contends that his attorneys were constitutionally ineffective during closing arguments. He argues that his trial attorneys misstated the law and the evidence during closing, resulting in numerous objections by the prosecutor and reprimands by the trial court, and necessitating another attorney to take over in the middle of closing.

The record indicates that defense counsel's closing argument was contentious. For instance, shortly after starting, counsel suggested that the jury would use its emotions to decide the case despite being instructed not to. The court sustained the objection and instructed the jury not to decide the case on emotions. Defense counsel also mentioned

the burden of proof and argued, "If you find one or more of them probable or reasonably possible, then you're required by the constitution, the judge, the jury instructions, the government, to enter a not guilty, and also a promise you made at the beginning." RP (June 4, 2019) at 1092. In response to the prosecutor's objection, the court reminded the jury that the law is contained in the jury instructions.

As closing continued, the court overruled most of the prosecutor's objections and noted a standing objection. Several times during closing, in response to the prosecutor's overruled objection, the court instructed the jury that counsel's argument was not evidence, that evidence is testimony, and the law is provided in the jury instructions.

Most of the prosecutor's objections were related to facts not in evidence, which was consistent with defense counsel's argument on the lack of evidence. At one point, defense counsel argued that the State's expert had testified that DNA transfer is "equally consistent" with non-sexual contact. The trial court sustained the State's objection and removed the jury.

After the jury was removed, the trial court scolded defense counsel for arguing facts not in evidence. The court pointed out that while a witness had testified it was "possible" to have DNA transfer, "[n]o one ever said that it's equally consistent with sexual assault and not sexual assault." RP (June 4, 2019) at 1100. While defense counsel promised to "rein it in," the prosecutor's objections continued, some of them overruled, some of them sustained. Overall, the prosecutor made 12 objections during the first part

20

of defense counsel's closing, four of which were sustained and eight overruled or not ruled on.

At one point, the court excused the jury again to address evidence in the record. Before the jury returned, Mr. Scott's second attorney received the court's permission to step in at a later time and handle the end of closing.

Shortly thereafter, Mr. Scott's first attorney referenced TRM's comment about her father. The court excused the jury and found that the comment violated the court's order in limine.[5] When the jury returned, Mr. Scott's second attorney finished closing arguments without incident.[6]

The right to effective assistance of counsel extends to closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id*. at 5-6. Closing

---

[5] On appeal, Mr. Scott argues that the trial court erred in finding the comment objectionable. He does not contend that the comment contributed to his attorney's ineffective representation.

[6] In his opening brief, Mr. Scott indicates that after Mr. Chapman took over, the remainder of closing argument was "uneventful." In his Reply Brief, Mr. Scott raises new allegations that even Mr. Chapman's closing argument was ineffective. We decline to address issues raised for the first time on appeal in a reply brief. RAP 10.3.

argument is one of the most strategic and tactical parts of a trial. For this reason, judicial review of an attorney's closing is highly deferential. *Id*. at 6.

In this case, defense counsel's arguments during closing pushed the envelope on evidence that was admitted and the reasonable inferences from the lack of evidence. This was a tactical decision. While it frustrated the prosecutor, we will not find counsel's performance deficient because the prosecutor continued to object, especially when a majority of the objections were overruled.

On appeal, Mr. Scott argues that his trial attorneys did not mention the revenge theory in closing. However, "[w]hen counsel focuses on some issues to the exclusion of others [in closing], there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Id*. at 8. Presenting a closing argument is like painting a landscape before a live audience. While it is easy to find the flaws after the fact, with the benefit of hindsight and a written record, the argument is not deficient if we can identify the subject matter.

> To recall the words of Justice (and former Solicitor General) Jackson: "I made three arguments of every case. First came the one that I planned-as I thought, logical, coherent, complete. Second was the one actually presented-interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night."

*Id*. at 8 (quoting Advocacy Before the Supreme Court, 37 A.B.A.J. 801, 803 (1951)).

Mr. Scott also derides his trial counsel for misstating the law, pointing to his comments about deciding cases on emotion and the burden of proof. It is clear from the record that trial counsel was not misstating the law, but rather attempting, somewhat ineloquently, to point out nuances in the jury instructions. In other words, he was attempting to remind the jury not to rely on emotions despite an inclination to do so. He was also pointing out that "probably guilty" is not beyond a reasonable doubt and still requires a verdict of not guilty. To the extent that these arguments may have caused confusion, the jury was instructed to refer to the jury instructions.

In *Kyllo*, defense counsel misstated the law in closing by arguing incorrectly that his client could use nonlethal self-defense only if he were in fear of death or grievous bodily harm. *Kyllo*, 166 Wn.2d at 870. Because this argument lowered the State's burden of proof, and there was no strategic or tactical reason for doing so, the court found counsel's performance to be deficient and prejudicial. *Id*. at 871. In this case, counsel's arguments do not lower the State's burden, and there are strategic reasons for making the arguments. We do not find defense counsel's argument to be deficient.

Even if we were to find that the performance was deficient, Mr. Scott would also have to prove prejudice. If a defendant fails to satisfy either prong, a court need not inquire further. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). To prove prejudice, Mr. Scott has the burden of showing there is a reasonable probability that but for counsel's poor performance the outcome of the proceedings would have been

23

different. *McFarland*, 127 Wn.2d at 334-35. In this case, Mr. Scott argues that the closing argument of his trial attorneys was ineffective, but he does not devote any portion of his brief to the prejudice prong.

Mr. Scott does suggest that the "string of objections" along with the trial court's admonishment may have influenced the jury's opinion of defense counsel. We note that only 4 of the prosecutor's 12 objections were sustained, 3 of them outside the jury's presence. And while the trial court became frustrated with defense counsel, and ultimately sanctioned him, this was done outside the jury's presence.

Counsel's argument was controversial, but we do not find a reasonable probability that the outcome of the proceedings would be different under a more conventional approach to closing. The evidence was significant, including Mr. Scott's DNA located during a forensic medical examination of one of the victims. The witnesses and evidence were thoroughly challenged. The court repeatedly directed the jury's attention to the instructions. In the end, the jury found Mr. Scott not guilty of half the charges.

C. ALLEGATIONS OF PRIOR ABUSE BY TRM

Next, Mr. Scott argues that the trial court made several erroneous evidentiary rulings pertaining to allegations of prior abuse suffered by TRM. More specifically, he contends that the court abused its discretion by 1) refusing to allow Mr. Scott to raise the subject after the State's witness opened the door, 2) finding that counsel's comment in closing violated the order in limine, 3) instructing the jury to disregard a witness's

comment that had not been struck and remained in the record, and 4) commenting on the evidence by striking the witness's comment during closing and instructed the jury to disregard the comment.

One of the contentious issues at trial was an allegation that TRM had been molested by her biological father when she was four years old. Before trial, the State moved in limine to prohibit any mention of the prior abuse as collateral, irrelevant, and protected by the rape shield statute. Defense counsel argued that the prior abuse of TRM would be used to attack her credibility on the basis that she routinely made false accusations and that Wendy Scott was using false accusations to retaliate. The State responded that the evidence was irrelevant and protected by the rape shield statute.

The trial court determined that the prior abuse allegation was not a rape shield issue but initially reserved on admissibility, instructing both parties that no one was allowed to reference the prior abuse at any point without court permission. The trial court readdressed its ruling twice at defense counsel's urging. The court indicated that while impeachment for credibility might be relevant, defense counsel had failed to present any evidence that the prior abuse allegations had been fabricated by either TRM or Wendy Scott. On that basis, the court excluded the prior abuse as irrelevant to credibility and impeachment. Thereafter, the trial court excluded all references and questions about prior abuse as speculative distraction, a "trial within a trial" prejudicial to proceedings.

During the direct testimony of TRM at trial, she made a spontaneous comment about her "dad." While questioning TRM about her first sexual incident with Mr. Scott, the prosecutor asked her, "Why did you take your clothes off?" RP (May 23, 2019) at 129. TRM answered "Because he wanted me to. . . . And he told me not to tell anybody, but first he was laying on the bed and saying, 'Please don't tell anybody or I'm going to get in trouble. I don't want that.' *This is what my dad used to do*. But yeah. It was pretty much it." RP (May 23, 2019) at 130 (emphasis added).

Neither side objected to the comment, the State quickly moved on, and defense counsel did not address the comment in cross-examination. However, just before the testimony of Wendy Scott, defense counsel moved to ask her about the prior abuse of TRM arguing that the door had been opened. After reviewing the record, the trial court ruled TRM's "dad" statement to be ambiguous, and that cross-examination had not clarified it enough to sufficiently "open" any door.

> [THE COURT:] It is not clear to me that this witness is referencing sexual conduct that the father may or may not have previously done. When I heard that, I heard that as not wanting to get Dad in trouble and him saying, "Don't tell anyone, I don't want to get in trouble." There was ambiguity there, and I can see why the defense could construe it a different way potentially. The time for resolving ambiguity was on cross-examination of that witness potentially, and I'm not saying I would have allowed that cross, but the request was not made to further illuminate that issue. As the record currently stands, this is what we have. The door is not sufficiently opened for me to allow the inquiry requested. My prior ruling stands.

RP (May 29, 2019) at 715.

26

Nevertheless, in closing argument defense counsel brought up TRM's comment:

[DEFENSE COUNSEL]: Now, there were a lot of weird things that kind of came into testimony, and I just want to kind of talk a little bit about some of them. And each of you have your in trying to put words into—I'm just going off my recollection. I was asking—or [TRM] was answering a question about a description of what Mr. Scott had done to her, and at one point she blurted out, "No, that's what my father did."

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I'm sorry. Okay.

THE COURT: Ladies and gentlemen, you are going to leave right now. Right now.

[DEFENSE COUNSEL]: Okay.

(Jury not present.)

THE COURT: Close the door, please, Betty. Show cause right now why I should not sanction you $2,000 payable to the Thurston County Volunteer Legal Services for intentionally violating the Court's order about this hard-fought issue where we're not referencing this. Mr. Hetter, why should I not sanction you?

[DEFENSE COUNSEL]: You—you indicated to me that I could not ask any further questions after you read the answer to that question on there. I'm not intentionally trying to do anything. I—t was an odd reference that the girl made. I'm indicating to the jury that I don't recall exactly what the reference was, but she did make that reference, Your Honor.

THE COURT: And what are you doing with it now, sir?

[DEFENSE COUNSEL]: I'm just saying that was one of the things that was an odd thing for her to say.

27

THE COURT: And what were you going to do with it next, sir?

[DEFENSE COUNSEL]: I was just—it was just an odd thing—

THE COURT: $2,000 payable to the Thurston County Volunteer Legal Services as a violation of this Court's order willfully. You will have an opportunity to ask for reconsideration at the conclusion of this trial why you believe that is not sanctionable. I cannot believe how anyone would think that we should be talking about that whatsoever given the length of time that we talked about this and how it's inappropriate for you to invite the jury to speculate as to what happened earlier, sir. I am beyond baffled that you have done this. I am very angry. I'm going to take a recess to make sure that I can calm myself down and properly judge the remainder of this case. I'm going to be back in five minutes.

RP (May 30, 2019) at 1117-1119.

When the jury returned, the court gave the following instruction:

THE COURT: Please be seated. Welcome back. Two things. First, the jury will disregard prior comments with regards to testimony by a witness about references to someone's father and what may or may not have occurred. Additionally, I will just remind you that statements by lawyers, both legal argument and facts, need to be supported by the evidence and my instructions. These closing arguments are merely intended to help you understand the facts and apply the law.

RP (May 30, 2019) at 1120.

*1. Open Door Policy.*

We review the trial court's evidentiary rulings for abuse of discretion. *State v. Hudlow*, 99 Wn.2d 1, 17-18, 659 P.2d 514 (1983); *State v. Warren*, 134 Wn. App. 44, 64-65, 138 P.3d 1081 (2006). The exercise of discretion in balancing the danger of prejudice against the probative value of the evidence is a matter within the trial court's discretion.

28

It should be overturned only if no reasonable person could take the view adopted by the trial court. *Hudlow*, 99 Wn.2d at 17-18. A trial judge, not an appellate court, is in the best position to evaluate the dynamics of a jury trial and, therefore, the prejudicial effect of a piece of evidence. *State v. Taylor*, 60 Wn.2d 32, 40, 371 P.2d 617 (1962).

In this case, the trial court's comment demonstrates why we give deference to its decision. While the witness's words are part of the record, the transcript does not provide tone, inflection, emphasis, and pauses. These are important to understand the meaning behind the words. Here, the court noted that its understanding of the witness's comment differed from defense counsel's understanding. Ultimately, the court ruled that the comment was ambiguous and did not open the door to exploring the allegation or prior abuse. Mr. Scott argues that this ruling was an abuse of discretion. We disagree.

"[T]he open door doctrine permits trial courts to admit evidence on a subject normally barred on policy or prejudice grounds, so long as the party who otherwise stands to benefit from exclusion has increased the subject's relevance through actions at trial." *State v. Rushworth*, 12 Wn. App. 2d 466, 475, 458 P.3d 1192 (2020). In this case, the State did not solicit the comment and did nothing to enhance its relevance. The comment was ambiguous, as even defense counsel noted at a later time. And there was no prejudice to Ms. Scott in prohibiting the comment from being further explored. The trial court did not abuse its discretion by holding that the comment did not open the door to question witnesses about allegations of prior abuse.

2. *Did Defense Counsel's comment in closing argument violate the court's order in limine?*

Before trial, the court excluded all references to the prior abuse without first obtaining the court's permission. When defense counsel sought to open the door after the comment, the court noted that the comment was ambiguous because, in context, her reference to "dad" could be referring to her biological father or Mr. Scott. Regardless, the court made it clear that its prior ruling on the issue would stand, and the door had not been opened.

In closing, counsel brought up the comment without seeking the court's permission or clarification. Defense counsel also mischaracterized the comment in a subtle yet profound manner. In response to a question about taking off her clothes, TRM testified that Mr. Scott was asking [TRM] not to say anything because he did not want to get in trouble. She then blurted out, "[T]his is what my dad used to do." In closing argument however, defense counsel argued, "[TRM] was answering a question about a description of what Mr. Scott had done to her, and at one point she blurted out, 'No, that's what my father did.'" RP (June 6, 2019) at 1118.

While TRM's comment was ambiguous, defense counsel attempted to argue that TRM was blaming her father and not Mr. Scott. This mischaracterization of the evidence violated the court's order that "the entire issue [of prior abuse] was foreclosed." By raising the issue without obtaining the court's permission, and by misstating the

30

comment, counsel violated the court's order in limine. The trial court did not abuse its discretion in reaching this conclusion.

3. *Did the court abuse its discretion and comment on the evidence when it instructed the jury to disregard evidence in the record?*

Mr. Scott argues that the trial court abused its discretion and commented on the evidence by instructing the jury to disregard evidence that was never struck from the record. This argument mischaracterizes the record. The court instructed the jury to disregard counsel's comment during closing, not the witness's comment during testimony: "First, the jury will disregard prior comments with regards to testimony by a witness about references to someone's father and what may or may not have occurred."

In light of our decision that counsel's comment violated the order in limine, the court did not abuse its discretion or comment on the evidence by instructing the jury to disregard defense counsel's comment.

Mr. Scott also contends that the court's instructions to the jury—that statements by the lawyers must be supported by the evidence or the jury instructions—was a comment on the evidence and improper because it suggests that defense counsel's argument was not supported by the evidence. The court's instruction mirrors language used in 11 *Washington Practice*: *Washington Pattern Jury Instructions*: *Criminal* 1.02, at 26 (5th ed. 2021). Mr. Scott does not cite any authority to support his argument that instructing the

jury with the neutral language of this pattern jury instruction is improper. We reject his

argument that the court's instruction constituted a comment on the evidence.

   D.   SUFFICIENCY OF EVIDENCE FOR COUNTS 1 AND 2.

Mr. Scott argues that the evidence was insufficient to support the convictions for

counts 1 and 2, child rape in the second degree against SNM.[7]

Evidence is sufficient to support a guilty verdict if any rational trier of fact,

viewing the evidence and inferences from it in the light most favorable to the State, could

find the elements of the charged crime beyond a reasonable doubt. *State v. Salinas*, 119

Wn.2d 192, 201, 829 P.2d 1068 (1992). When a defendant challenges the sufficiency of

the evidence, they admit the truth of all of the State's evidence. *Id.* Credibility

determinations are for the trier of fact and are not subject to review. *State v. Camarillo*,

115 Wn.2d 60, 71, 794 P.2d 850 (1990). The court must defer to the trier of fact on

issues of conflicting testimony, the credibility of witnesses, and the persuasiveness of the

evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

While acknowledging the test for sufficiency of the evidence and this court's

inability to weigh evidence on appeal, Mr. Scott raises issues of credibility and weight;

not sufficiency. He argues that there was insufficient evidence to support count 1,

---

   [7] Despite purporting to challenge the sufficiency of all counts in his assignment of error, Mr. Scott only challenges Counts 1 and 2. Therefore, the other convictions will not be reviewed for sufficiency.

alleged to have occurred on October 5, 2017, because SNM's mother was home at the time, and Mr. Scott provided alibi evidence for that date. Mr. Scott also contends that SNM's testimony about the dates for count 2 was inconsistent, required leading questions, and not believable. These arguments go to credibility. SNM testified that the first time Mr. Scott raped her was after May 2017. She also testified that Mr. Scott raped her on October 5. This evidence is sufficient to establish the dates. It is up to the jury to determine issues of credibility and weigh the evidence. The evidence was sufficient to support the jury's verdict of guilty on counts 1 and 2.

E.    CUMULATIVE ERROR

Mr. Scott's final substantive challenge is that cumulative error denied him a fair trial. The cumulative error doctrine applies only when several trial errors occurred that may not be individually sufficient to justify a reversal, but when combined together, may deny a defendant a fair trial. *Greiff,* 141 Wn.2d at 929. The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. *In re Pers. Restraint of Lord,* 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964 (1994).

Where, as discussed above, discovery violations were not preserved, the trial court committed no errors, nor did defense counsel render ineffective assistance, Mr. Scott has failed to show cumulative error warranting reversal of his convictions.

F.    STATEMENT OF ADDITIONAL GROUNDS

Mr. Scott raises several issues in his statement of additional grounds about his attorney's performance at trial.  He contends that his attorney: (1) failed to cross-examine TRM on her memory deficiencies and allowed the prosecutor to ask her leading questions, (2) told Mr. Scott that he should not testify, (3) provided confidential information to the prosecutor before trial, and (4) failed to call expert and alibi witnesses.

To support his arguments, Mr. Scott submits information in his declaration outside the record on appeal.  Because this is a direct appeal, we will not consider evidence outside the record.  *McFarland*, 127 Wn.2d at 335.  Mr. Scott can raise these issues in a personal restraint petition.  *Id.*

G.    CLERICAL ERRORS

Procedurally, Mr. Scott points out clerical errors in the judgment and sentence and warrant of commitment.  The judgment and sentence correctly lists Count 6 as child molestation in the second degree pursuant to RCW 9A.44.086 (seriousness level VII) subject to 116 months' confinement and 36 months' community custody, however, the preprinted form grid contains a maximum term of "life" that was not scratched out even though the proper sentence is handwritten in the grid immediately to the left.  The Warrant of Commitment attached to the judgment and sentence lists Count 6 as "[Child Molestation in the first degree]," a class A felony with a maximum term of life, instead of child molestation in the second degree a class B felony.

No. 37990-6-III
*State v. Scott*

The State concedes the error.

CONCLUSION

We affirm Mr. Scott's convictions and remand to correct the judgment and sentence and warrant of commitment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Siddoway, J.