# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 59926-1-II |
| JASON ROBERT GARCIA, | |
| Petitioner. | UNPUBLISHED OPINION |

GLASGOW, J.—In July 2020, Jason Garcia robbed Michael Robertson and Theresa Curtis while trapping them in a room at Christopher Ryan's house. Robertson and Curtis managed to escape. Ryan, Robertson, and Curtis all identified Garcia as the perpetrator and testified that Garcia drove a red motorcycle and wore a blue motorcycle helmet to pursue Robertson and Curtis as they escaped. Garcia admitted to police that he was at Ryan's house that day but denied participating in the robbery.

The State charged Garcia with two counts of first degree robbery and two counts of unlawful imprisonment, among other crimes. A week before Garcia's trial, after Garcia made several written requests to his counsel to obtain DNA testing of the blue motorcycle helmet, defense counsel requested a continuance to do so. Defense counsel argued that though Garcia said he owned the red motorcycle, he was not the person in the blue helmet on the motorcycle, and DNA testing would show his innocence.

The trial court denied the motion to continue because Garcia's trial had already been significantly delayed and DNA results from the blue helmet would not have been exculpatory. After the trial, the jury convicted Garcia of both counts of first degree robbery and both counts of unlawful imprisonment. Garcia's convictions were affirmed on direct appeal.

Garcia brings this personal restraint petition, arguing that his defense counsel was ineffective for failing to request DNA testing of the blue helmet sooner. Garcia also argues that the State violated his due process rights by failing to collect or affirmatively disclose that the police did not collect the blue helmet as physical evidence. Finally, Garcia claims that the trial court violated his right to be present at all critical stages of trial by denying defense counsel's motion for a continuance at a hearing where Garcia was absent.

We conclude that defense counsel's failure to ask for DNA testing of the blue helmet sooner was not prejudicial where the results would not have been exculpatory in light of other strong evidence of Garcia's guilt. We also hold that the State did not violate Garcia's due process rights, and Garcia failed to show that his absence at the continuance hearing caused him actual prejudice. Accordingly, we deny Garcia's petition.

FACTS

I. BACKGROUND

On July 28, 2020, Jason Garcia went to Christopher Ryan's house to drop off a car. Garcia was wearing a light tank top, dark pants, and red sneakers. While Garcia was at Ryan's house, he spent time in the garage with Ryan and both of their girlfriends. In the garage, Garcia and Ryan smoked methamphetamine and discussed a plan to rob Michael Robertson.

Security camera footage showed that Garcia and his girlfriend left Ryan's house at about 5:00 p.m. Ryan testified that Garcia returned several minutes later on a red motorcycle, wearing a blue helmet, and security camera footage showed a person in a white t-shirt and dark pants arriving at Ryan's house on a motorcycle at that time.

At about 5:30 p.m., Ryan sent text messages to a friend indicating that Garcia was at his house and they were planning on robbing Robertson. At approximately 6:00 p.m., Michael Robertson and his girlfriend, Theresa Curtis, arrived at Ryan's house. They entered Ryan's bedroom where Ryan was waiting. Garcia then entered the bedroom and told Robertson and Curtis to empty their pockets onto the bed. Ryan, Robertson, and Curtis all testified that Garcia pointed a gun at Robertson and Curtis and refused to let them exit the bedroom.[1] Garcia threatened to rape Curtis. He also assaulted Robertson with his fists and the gun, which resulted in injuries to Robertson's face.

At some point, Garcia saw through a window that people were approaching Ryan's house. He left the bedroom. Robertson and Curtis took the opportunity to escape and a security camera captured them driving away at 6:23 p.m. Security footage also showed a man with red shoes and a white piece of clothing draped over his shoulder watching Robertson and Curtis get into their car at this time. A minute later, the footage captured a man with what appeared to be a cloth over his shoulder leaving Ryan's house on a motorcycle. Ryan, Robertson, and Curtis testified that Garcia followed Robertson and Curtis on his motorcycle until they pulled over next to a police car. After pulling over, Robertson identified Ryan and Garcia by name when describing the incident to police. Curtis gave an accurate physical description of Garcia.

That same day, police found a red motorcycle and blue motorcycle helmet outside Garcia's home, which was on his parents' property. They took pictures of the motorcycle and helmet but did not collect them.

---

[1] The jury did not find that Garcia used a firearm, though Ryan, Robertson, and Curtis testified consistently that Garcia had a pistol.

The following day, July 29, police interviewed Ryan, who identified Garcia as the person who helped him rob Robertson and Curtis. Later that day, police also interviewed Garcia. Garcia denied that he knew Ryan or Robertson. Garcia initially said he was not at Ryan's house the night of the robbery. However, he later said that he did go to Ryan's house to drop off a car that day, and he talked with Ryan and their girlfriends in the garage. Garcia denied any knowledge of the robbery. He claimed that during the afternoon, he was at a friend's house for a pool party. Garcia also said that several people rode his motorcycle on the day of the robbery. Police collected the black pants and red shoes that Garcia wore the day of his interview because the police thought Garcia's clothes matched the clothing worn by the person riding the motorcycle in the security footage.

## II. CHARGES & PRETRIAL

The State charged Garcia with two counts of first degree robbery with firearm enhancements, two counts of unlawful imprisonment with firearm enhancements, and one count of first degree unlawful possession of a firearm.

In July 2021, about a year after the robbery, Garcia sent three letters to his defense counsel asking counsel to obtain DNA testing on the blue motorcycle helmet. Garcia wrote that he had told defense counsel that the helmet was not his and DNA tests would be proof of his innocence. Garcia also asked his counsel to try to get the trial court to exclude a picture of the blue helmet from the evidence at trial.

In September 2021, Garcia's defense counsel responded to Garcia's requests to DNA test the blue helmet and exclude a photograph of the helmet. Defense counsel stated that these requests were inconsistent and noted, "It would take months to get a DNA result from the crime lab and

4

extremely expensive privately. I will need serious justification to ask for funds for that." Br. in Supp. of Pers. Restraint Pet. (Pet'r's Br.), App. A.

A.      Continuance Hearing

Garcia's trial was scheduled for November 29, 2021. On November 22, a week before trial, defense counsel moved to continue the trial in order to conduct DNA testing on the blue motorcycle helmet and the trial court held a hearing. Due to COVID-19 restrictions, Garcia was not present at this hearing. At the hearing, defense counsel claimed that DNA tests of the blue helmet could be exculpatory for Garcia because Garcia denied wearing the helmet at any point.

The State first argued that because police did not collect the helmet as evidence and it was found at Garcia's residence, it was Garcia's responsibility to find the helmet and request testing earlier in the proceedings. The State further argued that Garcia had said many individuals rode the motorcycle the day of the robbery, so test results showing another person's DNA on the helmet would not be exculpatory. Finally, the State objected to the continuance because DNA testing could delay trial for up to a year. Defense counsel clarified that Garcia only alleged that other people rode his motorcycle, not that they wore the blue helmet, which Garcia denied owning at all.

The trial court first addressed Garcia's absence:

> The defendant's in custody and because of COVID and COVID protocols within the jail, we don't transport individuals from jail to the court except for limited times and a request for continuance is not one of the situations that is necessary to have the defendant's presence. The attorneys are able to articulate their client's position.

Pet'r's Br., App. B at 10. The trial court further noted that at that point, Garcia's case was 480 days old and had already been continued several times. The trial court denied defense counsel's motion for a continuance and stated,

> So this is an issue that hasn't come up until here we are a week before trial, and I agree that given the age of this case, given what appears to be something that isn't going to provide necessarily exculpatory evidence, the Court is going to deny the request for the continuance.

*Id.* at 11.

## III. TRIAL

At trial, Ryan testified that he and Garcia robbed Robertson and Curtis in a manner consistent with the facts recited above. Ryan testified that he had met Garcia several times prior to the robbery. Ryan also testified that he had several security cameras at his house, and the jury saw security camera footage taken the day of the robbery. Ryan identified Garcia as the person on the red motorcycle wearing a blue motorcycle helmet in this footage.

Curtis and Robertson also provided testimony consistent with the events described above. Curtis testified that she had not seen the perpetrator before the robbery, but she described him as a tall, bald, thin man with facial hair who was wearing a white tank top and dark pants. She identified Garcia as the perpetrator. Robertson testified that he knew Garcia before the robbery and identified Garcia as the perpetrator.

Garcia also testified at trial. Garcia said that he left Ryan's house at about 5:00 p.m. and went to his friend's pool party. He denied knowing Robertson or participating in any robbery. He also said that he owned only a red motorcycle helmet and had never seen the blue motorcycle helmet that police photographed near his residence. When the State asked why Garcia did not retrieve his red motorcycle helmet as evidence, he replied, "I didn't think of that. I was thinking of DNA swabbing the blue helmet which never happened." 6 Verbatim Rep. of Proc. (VRP) at 21.

Garcia's friend and her teenage son both testified that on the day of the robbery, Garcia arrived at their house for a pool party at about 5:00 p.m. Based on the security footage and testimony, the robbery occurred when Robertson and Curtis were at Ryan's house between 6:00 p.m. and 6:23 p.m.

## IV. JUDGMENT, SENTENCING, AND DIRECT APPEAL

The jury convicted Garcia of two counts of first degree robbery and two counts of unlawful imprisonment. The jury was unable to reach a unanimous verdict on the first degree unlawful possession of a firearm charge and the firearm sentencing enhancements, so it left those verdict forms blank. The trial court sentenced Garcia to 171 months.

Garcia filed a direct appeal, and this court affirmed his convictions. *State v. Garcia*, No. 56819-5-II, slip op. at 1 (Wash. Ct. App. Mar. 28, 2023) (unpublished).[2] In his direct appeal, Garcia brought claims that the trial court erred by denying his request to conduct DNA testing on the motorcycle helmet and that his defense counsel was ineffective for failing to request that the State produce the helmet. *Garcia*, slip op. at 13. This court rejected these claims because they involved "facts outside the scope of the appellate record." *Id.*

Garcia now brings this timely personal restraint petition.

## ANALYSIS

### I. PERSONAL RESTRAINT PETITION STANDARDS

A petitioner carries the initial burden to support their personal restraint petition. RAP 16.4; *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). A petitioner must prove

---

[2] https://www.courts.wa.gov/opinions/pdf/D2%2056819-5-II%20Unpublished%20Opinion.pdf

either a constitutional error that results in actual and substantial prejudice or a nonconstitutional error constituting a fundamental defect that inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). The petitioner must support the petition with facts or evidence and may not rely solely on conclusory allegations. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013); *see* RAP 16.7(a)(2)(i). For constitutional errors, the petitioner must prove prejudice by a preponderance of the evidence. *Lord*, 152 Wn.2d at 188.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Garcia argues that his defense counsel was ineffective because she did not timely request DNA testing of the blue motorcycle helmet. Garcia argues that DNA testing of the blue helmet "could have confirmed that Garcia had never worn the blue helmet and, therefore, could not have been the individual seen arriving and leaving the scene on July 28." Pet'r's Br. at 14. Garcia claims that defense counsel's decision not to request collection and testing of the helmet constituted an impermissible failure to investigate.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). For an ineffective assistance of counsel claim, a petitioner must show that their counsel's performance was deficient and caused the petitioner prejudice. *Grier*, 171 Wn.2d at 32-33. A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

To prove prejudice, a petitioner must show that, but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). If a person proves prejudice under this test, they also necessarily meet the required showing of actual and substantial prejudice for a personal restraint petition. *Id.*

Ineffective assistance of counsel claims may be based on counsel's failure to investigate a potential defense. *See, e.g.*, *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 739, 101 P.3d 1 (2004). The petitioner "must show a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Id.* Even if a defendant can show such information would have been uncovered, the potential resulting prejudice must be considered in light of the strength of the State's case. *Id.*

In *State v. Riofta*, a DNA testing issue arose under a different procedural posture but with similar facts. 166 Wn.2d 358, 361, 209 P.3d 467 (2009). Riofta sought postconviction DNA testing under RCW 10.73.170 of a hat that the perpetrator wore, which the trial court denied. *Id.* The Washington Supreme Court affirmed the trial court's denial, holding that even if DNA testing of the hat showed the absence of Riofta's DNA and the presence of another person's DNA, this result would not raise the reasonable probability of Riofta's innocence in light of the other evidence presented at trial. *Id.* at 373. The Supreme Court reasoned that the hat was potentially worn by the shooter only for a short period of time, Riofta's head was shaved, and "a number of people besides the shooter could have worn the white hat at some time" before the shooting. *Id.* at 370. The Supreme Court emphasized that even assuming favorable DNA evidence, it would not be convincing in light of other evidence of Riofta's guilt, including the victim's strong eyewitness

identification of Riofta by name and appearance, evidence of Riofta's motive, and the fact that police found the car involved in the shooting blocks from Riofta's house. *Id.* at 371-72. Thus, the Supreme Court concluded that even a favorable DNA result would not reasonably demonstrate that somebody besides Riofta wore the hat during the shooting. *Id.* at 373.

Here, although Garcia's argument arises under a personal restraint petition claim about pretrial DNA testing rather than posttrial testing, we apply reasoning similar to that in *Riofta.* Garcia has not shown a reasonable probability that requesting a DNA test of the blue motorcycle helmet earlier in the proceedings would have changed the outcome of the trial. *See Lui*, 188 Wn.2d at 538. The trial court denied defense counsel's motion for a continuance to DNA test the blue motorcycle helmet both because the trial had already been significantly delayed *and* because testing "[wasn't] going to provide necessarily exculpatory evidence." Pet'r's Br., App. B at 11. This was consistent with *Riofta*. Although the Supreme Court in *Riofta* was applying a different standard for postconviction DNA testing motions under RCW 10.73.170(3), the court reasoned that favorable DNA test results from the hat in question would not raise the reasonable probability of Riofta's innocence given significant evidence of Riofta's guilt at trial, including strong eyewitness identifications of Riofta as the shooter, and the possibility that people other than the perpetrator wore the hat within a short time period. 166 Wn.2d at 371-73.

Similarly, in this case, Garcia denied ever wearing the blue motorcycle helmet. Given that other people used the same motorcycle, the helmet, which was found near the motorcycle at Garcia's home, could have been worn by any number of people before police located and photographed it. And because the police did not collect the helmet as physical evidence, many people could have worn the helmet in the year *after* the robbery but before Garcia first requested

that his counsel arrange for DNA testing, potentially leaving traces of their DNA. Accordingly, the presence of another person's DNA on the blue motorcycle helmet would not necessarily mean that person was the perpetrator.

An absence of Garcia's DNA on the blue motorcycle helmet also would not have been likely to change the outcome of the trial. Like Riofta, Garcia was bald or near bald when the robbery occurred, so it would not be surprising if he left no DNA evidence in the helmet. Additionally, the other evidence of Garcia's guilt was similar to the quality of evidence in *Riofta*. The witnesses' identification of Garcia during the actual robbery was significant, relevant evidence. Three separate people, both victims and a coconspirator, identified Garcia as the perpetrator of the robbery either by name or appearance or both. Ryan's text messages just before the robbery showed Garcia intended to participate in the robbery. Additionally, security camera footage showed a person Ryan identified as Garcia arriving at Ryan's house on a motorcycle before the robbery and a person in the same clothes Garcia was wearing earlier in the day—including distinctive red shoes—watching Robertson and Curtis leave during the robbery. And while Garcia said he used only a red motorcycle helmet, police found Garcia's motorcycle and a blue motorcycle helmet like the one the perpetrator wore at Garcia's residence soon after the robbery.

Like in *Riofta*, the absence of Garcia's DNA would not be convincing against this quantity of evidence, particularly where the presence of a person's DNA on the blue motorcycle helmet would not necessarily identify the robbery perpetrator because Garcia said that several other people used the motorcycle. And given Garcia's bald or nearly bald hairstyle, as well as the whole year that had elapsed before Garcia asked counsel to obtain a DNA test, like in *Riofta*, the lack of Garcia's DNA would not be exculpatory. Accordingly, we agree with the trial court that DNA

11

testing of the blue motorcycle helmet would not have been exculpatory, and its admission would not have changed the outcome of Garcia's trial. As a result, defense counsel's decision to request DNA testing of the blue motorcycle helmet a week before trial did not prejudice Garcia and did not constitute ineffective assistance of counsel.

### III. THE STATE'S RESPONSIBILITIES

Garcia claims that the State violated his due process rights by failing to collect the blue motorcycle helmet or disclose that the helmet was left on Garcia's property. We review due process claims de novo. *State v. Mullen*, 171 Wn.2d 881, 893, 259 P.3d 158 (2011).

### A.    Collection

Generally, the police do not have "'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.'" *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). Significantly, this rule does not require police to search for or *collect* exculpatory evidence. *State v. Armstrong*, 188 Wn.2d 333, 345, 394 P.3d 373 (2017).

In Washington, once evidence is collected, the State is required to disclose and preserve "all potentially material and favorable evidence" to ensure protection of criminal defendants' state and federal due process rights. *Id.* If the State has not preserved "material exculpatory evidence," then the criminal charges must be dismissed. *Wittenbarger*, 124 Wn.2d at 475. Material exculpatory evidence is evidence that possesses "'an exculpatory value that was apparent before it was destroyed'" and is "'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Armstrong*, 188 Wn.2d at 345

(quoting *Wittenbarger*, 124 Wn.2d at 475). For evidence that is not material exculpatory evidence, "failure to preserve by the police is not a denial of due process unless the suspect can show bad faith by the State." *Id.*

In *Armstrong*, police never collected relevant surveillance videos from a gas station where the defendant pursued the victim, and the gas station later deleted the footage. 188 Wn.2d at 336-37. At trial, officers explained that they did not collect the videos because they assumed collection was another officer's responsibility or did not know such videos existed. *Id.* at 337. The Washington Supreme Court held that Armstrong failed to show the police acted in bad faith, as the officers' testimony indicated "that the video went uncollected due to mere oversight," and the failure to collect did not violate any written policy. *Id.* at 346.

Here, police photographed the blue motorcycle helmet but did not collect it as physical evidence. As discussed in our assessment of Garcia's ineffective assistance of counsel claim, DNA testing of the blue motorcycle helmet would not have been material exculpatory evidence for Garcia. The helmet was only potentially useful evidence, and Garcia fails to allege any facts indicating that the State acted in bad faith by not collecting the helmet after photographing it. *See id.* at 346. Furthermore, the police are not required to search for exculpatory evidence, and Garcia does not cite any cases demonstrating that failure to *collect* evidence violates a criminal defendant's due process rights. *Id.* at 345. This is particularly true where, as here, there is no indication that the blue motorcycle helmet was ever destroyed. Law enforcement left the helmet at Garcia's home, which is also where his parents lived. Thus, Garcia's defense counsel could have taken steps to obtain the helmet.

Accordingly, the State did not violate Garcia's due process rights by not collecting the blue motorcycle helmet as evidence.

B.      Disclosure

In his petition, Garcia cites *Brady v. Maryland* as authority for his argument that the State had a duty to disclose that it did not collect the blue motorcycle helmet. 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *Brady* holds that the State's suppression of exculpatory or impeachment evidence in the *possession* of prosecutors or law enforcement violates a criminal defendant's due process rights. *Mullen*, 171 Wn.2d at 894. However, the State "'is under no obligation to turn over materials not under its control.'" *Id.* at 895 (quoting *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991)). Additionally, where "'a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government.'" *Id.* at 896 (quoting *Aichele*, 941 F.2d at 764). Here, the State did not have the blue motorcycle helmet in its possession, so it was not required to disclose the blue motorcycle helmet's location.

Garcia claims that the State misled him by initially stating that it had collected the helmet. In the State's trial brief filed on June 1, 2021, the State said that police "located" the blue motorcycle helmet. Clerk's Papers (CP) at 16. In its response to Garcia's motion to suppress video evidence, filed on November 12, 2021, the State wrote that the jury would have to decide "whether the blue helmet worn by the robber is the same blue helmet recovered at defendant's residence." CP at 46. Garcia presents no other evidence that the State said it ever had the blue motorcycle helmet in its possession. These quotes alone do not demonstrate that the State misled Garcia as to the location of the helmet, nor that Garcia lacked enough information to be able to ascertain for

himself the location of the helmet, which was left at his residence on his parents' property. As a result, Garcia does not demonstrate that the State violated his due process rights by failing to inform him *sua sponte* that it had not collected the blue motorcycle helmet.

Garcia's due process claim against the State fails.

## IV. RIGHT TO BE PRESENT

Garcia argues that the trial court violated his right to be present at all critical stages of the proceedings by denying defense counsel's motion for a continuance to test the blue motorcycle helmet at a hearing he did not attend.

"A criminal defendant has a fundamental right to be present at all critical stages of a trial." *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). We review a claim that the trial court violated a defendant's constitutional right to be present de novo. *State v. Fehr*, 185 Wn. App. 505, 512, 341 P.3d 363 (2015). A petitioner alleging a constitutional error must show actual and substantial prejudice. *Swagerty*, 186 Wn.2d at 807.

A critical stage is one where the defendant's presence has a reasonably substantial relation to "'the fullness of his opportunity to defend against the charge.'" *Irby*, 170 Wn.2d at 889 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). However, criminal defendants do not have the right to be present when their "'presence would be useless, or the benefit but a shadow,'" like during in-chambers or bench conferences about legal or ministerial issues. *Id.* (quoting *Snyder*, 291 U.S. at 106-07).

In *In re Pers. Restraint of Benn*, the Washington Supreme Court held that a criminal defendant did not have the right to be present during a continuance hearing because the hearing

did not involve the presentation of evidence, decisions about the admissibility of evidence, or the availability of a defense or theory of the case. 134 Wn.2d 868, 920, 952 P.2d 116 (1998).

Garcia attempts to distinguish this case from *Benn*. He argues that by ruling on the continuance, the trial court "also determined the admissibility of the DNA evidence," which had the "practical effect of suppressing any DNA test results." Pet'r's Br. at 21. Garcia thus claims that his presence during the hearing was "essential" for his defense and may have impacted the outcome of the trial. *Id.* But he does not explain what would have occurred differently had he been present. Accordingly, even if the continuance hearing impacted the admissibility of evidence or cut off a possible avenue of defense —though we note that the trial court did not actually decide on the admissibility of DNA results from the blue motorcycle helmet during the continuance hearing— Garcia has failed to show that his absence at the hearing resulted in actual prejudice. He does not explain what he would have told his counsel that she did not already know, what argument his counsel would have made that she did not present to the trial court, or how the outcome of the trial may have been impacted by his presence at this hearing.

Additionally, we acknowledge that this hearing took place in November 2021 during the COVID-19 pandemic. In February 2021, the Washington Supreme Court entered an order stating that defense attorneys could sign continuance orders without signatures from defendants and courts should allow attorneys to waive their client's presence at continuance hearings "unless their presence is deemed necessary by the court." *In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency*, No. 25700-B-658, at 9 (Wash. Feb. 19, 2021).[3]

---

[3] https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/25700-B-658.pdf

No. 59926-1-II

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/25700-B-658.pdf. The trial court specifically noted COVID-19 protocols to explain Garcia's absence at the continuance hearing and said his absence would not "change the ability of [Garcia's defense counsel] to argue his position." Pet'r's Br., App. B at 10. Garcia's counsel did not object to moving forward with the hearing without Garcia present.

We thus deny Garcia's claim that the trial court violated his right to be present at trial.

CONCLUSION

We deny Garcia's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

LEE, P.J.

CHE, J.